UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARA CONNELLY and RICHARD BRYAN WILSON, on behalf of themselves and all others similarly situated,

        Plaintiffs,

            v.

LGI HOMES, INC., LOANDEPOT, INC., and LGI MORTGAGE SOLUTIONS, LLC,

        Defendants.

_____/

Civil Action No.: _____

CLASS ACTION

DEMAND FOR JURY TRIAL

1.     Plaintiffs Mara Connelly ("Ms. Connelly") and Richard Bryan Wilson ("Mr. Wilson" (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action on behalf of themselves and classes comprising of all other persons and entities similarly situated who purchased a home from Defendant LGI Homes, Inc. ("LGI" or the "Company"), including without limitation those persons and entities that purchased such home with a loan originated by Defendant loanDepot Inc. ("Loan Depot") and/or Defendant LGI Mortgage Solutions, LLC ("LGI Mortgage"), for which LGI advertised a monthly payment lower than the actual monthly payment owed, and were damaged thereby (as defined below in Paragraph 158, the "Classes").

1

2.      Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs themselves, which are alleged upon personal knowledge. Plaintiffs' information and belief is based on Plaintiffs' counsels' investigation, which included the review and analysis of, among other things: (a) investigative reporting including an in-depth investigation published by Hunterbrook Media (the "Hunterbrook Report"); (b) regulatory filings made by LGI with the U.S. Securities and Exchange Commission ("SEC"); (c) public statements made by LGI; and (d) other publicly available information.

3.      Hunterbrook Media, a global investigative journalism firm, has conducted an extensive investigation into Defendants' business practices (the "Hunterbrook Report").[1] Plaintiffs' counsel has collaborated with Hunterbrook Media in the preparation of this Complaint, and, in addition to the publicly available materials referenced above and in the Hunterbrook Report, has obtained proprietary investigative materials developed by Hunterbrook Media supporting the allegations herein. Hunterbrook Media is also affiliated with Plaintiffs' counsel at Hunterbrook Law.

---

[1] Hunterbrook Media, *Buyer's Remorse: How LGI Homes Lures Renters Into Buying Homes They Can't Afford*, https://hntrbrk.com/investigations/lgih (last visited July 27, 2026).

## **INTRODUCTION**

4.    This case concerns Defendants' abusive, improper home-sales scheme, including high-pressure sales tactics and numerous materially false and misleading representations, that has caused — and continues to cause — substantial harm to home purchasers in Florida.

5.    Defendants' scheme is simple: LGI targets populations of renters, typically communities that are economically disadvantaged and/or that predominantly comprise racial minorities, with deceptive advertising promising potential customers that they can own a home for the same monthly cost as renting (or less) and quoting specific monthly-payment numbers. Once the potential customers make contact with LGI, the Company deploys a high-pressure sales playbook to ensure: (1) that the customer has no independent advisors (like a realtor or mortgage broker) to guide them through the process; and (2) that they are forced to make a decision on the biggest purchase they have ever made as soon as possible — often the same day.

6.    Time and again, for years, Defendants — homebuilder LGI, home mortgage lender loanDepot, and LGI and loanDepot's joint venture LGI Mortgage — have worked in concert to sell homes to vulnerable individuals, at higher prices and greater cost than the purchasers can afford, leading to a spate of

financial troubles and foreclosures, all while generating massive fees and revenues for Defendants.

7.    Defendant LGI is a top national homebuilder that has been in operation since 2003. LGI intentionally targets renters and first-time homebuyers by operating a deceptive and deliberately designed "bait-and-switch" sales-and-marketing scheme that conceals from homebuyers the true monthly cost of purchasing its homes. LGI homes are represented to be more affordable than competitors' properties, which lures unsuspecting customers in. To carry out its scheme, LGI works with a mortgage lender, loanDepot, Inc., to market and entice homebuyers who are largely lower-income and minority Americans, by promising and advertising to them artificially low, affordable monthly payments, while concealing the true cost of homeownership.

8.    Many of Defendants' customers are participants in the Federal Housing Administration's ("FHA") mortgage program for working- and middle-class Americans with limited savings and little margin for unexpected housing costs.

9.    Defendants have implemented their scheme through four primary steps. First, LGI, which describes itself as primarily a "sales and marketing" company rather than a homebuilding company, identifies areas largely populated by renters, many of whom are people of color, military veterans, or have relatively

low incomes. LGI aggressively blankets those areas with advertisements and marketing materials, including without limitation mailings to targeted customers' homes; billboards and other public, physical advertisements; and targeted advertisements on online platforms such as Facebook. In those advertisements, LGI touts a simple proposition: why rent a home when you can buy one for the same monthly cost (or less)? LGI represents that it builds and sells homes at low cost to homebuyers such that renters can easily become owners, including for as low as $799/month with no down payment.

10.   <u>Second</u>, once those targeted potential homebuyers contact LGI, Defendants commence their misleading and high-pressure sales tactics in earnest. LGI requires that its sales employees, which make up a substantial portion of the Company's workforce, follow the Company's training and the procedures set forth in the Company's sales manual. Among other things, LGI's salespeople are trained to rush customers through the sales process, blowing through and brushing past any hesitation or concern customers express. This is particularly egregious when it comes to home prices and costs. Contrary to LGI's low represented home prices and monthly costs, homes regularly cost materially more, with additional items and fees tacked on, and monthly costs—particularly on the no- or low-money down terms LGI advertises—are regularly greater than

represented amounts and the costs of renting or purchasing comparable homes in the market.

11.     Moreover, following the Company's training and the sales manual, because sales representatives are expected to convince 20% of shoppers to purchase a home on their first visit, sales representatives: repeatedly tell customers that houses are moving quickly and that the customers must purchase homes right away or else the homes may not be available; require that customers travel to visit properties in vehicles driven by LGI salespeople rather than drive their own vehicles; run homebuyers' credit in violation of federal law; and insist that the customers close on their purchases nearly immediately while refusing to answer many of those customers' questions. And LGI regularly refuses to permit customers to use their own brokers or agents, insisting that they work only with LGI.

12.     Third, LGI then funnels its customers to loanDepot, including through LGI's and loanDepot's joint venture, LGI Mortgage, to finance the home purchase. Even when customers have a preexisting relationship with another financial institution or are pre-approved for loans at particular rates and/or amounts, Defendants typically pressure homebuyers to finance their purchases through loanDepot/LGI Mortgage. Doing so generates substantial fees and revenues for Defendants while helping ensure that no independent third party—

6

who might raise concerns about the value of the homes or otherwise about the purchases—is involved in the process.

13.     And <u>fourth</u>, once homebuyers have purchased a home and entered into a mortgage contract with Defendants, the homebuyers (that is, the members of the Classes) are left holding the bag. Monthly payments are substantially greater than originally represented due to factors such as additional and rising fees and undisclosed financing costs. Construction is frequently shoddy. LGI does not adequately respond to requests for service as it represented it would. Between poor home quality and higher-than-represented cost, many purchasers find their mortgages underwater, leading to significantly higher foreclosure rates than associated with other homebuilders. Resale values are low and offer little relief. Class Members find themselves trapped in homes they were pressured into buying before having the rug pulled out from under them, while Defendants continue their deceptive scheme at their next development. Inevitably, the pattern of abuse and harm repeats itself.

14.     The difference between the cost at which LGI advertises its homes and the cost that its customers ultimately pay is catastrophic for many Class Members, as they are forced to scrape together substantially greater payments every month to avoid foreclosure.

15.    Plaintiffs' experiences discussed herein are typical of members of the Classes. For example, in its advertisements—which Plaintiff Mara Connelly had been receiving in the mail since 2018—LGI represented that Ms. Connelly would pay $1,900 a month for an LGI home. Defendants did not disclose Homeowners' Association ("HOA") fees and taxes to Ms. Connelly when she visited the LGI sales office. LGI also directed Ms. Connelly to use loanDepot for her mortgage. But only after Ms. Connelly put down a nonrefundable deposit did she learn that she would have to pay extra fees such as HOA fees and taxes. Since buying her house, Ms. Connelly has had to pay roughly $2,450 a month for her LGI home—nearly 30% greater than the price LGI advertised. Moreover, that number is only increasing as taxes and HOA fees increase. Defendants never disclosed to her that those increased payments would be required.

16.    Similarly, based on the Company's advertisements and representations, when Plaintiff Bryan Wilson signed his purchase agreement with LGI he believed that he would be paying $300,000 for his LGI-manufactured house and would not be required to pay a down payment. It was only after Mr. Wilson signed the purchase agreement and went to the closing that he found out he would be paying a $3,000 down payment. LGI also directed Mr. Wilson to use loanDepot for his mortgage despite his being eligible for a loan from Veterans Affairs.

17.     Plaintiffs bring this class action lawsuit on behalf of those victimized by Defendants' scheme. Plaintiffs seek redress for Class Members, who are all homebuyers who purchased their homes from LGI ("Homebuyers"), including but not limited to damages, disgorgement of profits from Defendants for this illegal scheme, restitution, and injunctive relief to ensure that Defendants do not continue to hurt unsuspecting buyers.

**PARTIES**

18.     Plaintiff Mara Connelly is a natural person living in Brooksville, Florida. At all times material hereto, Ms. Connelly was a citizen of Florida.

19.     Plaintiff Richard Bryan Wilson is a natural person living in Brooksville, Florida. At all times material hereto, Mr. Wilson was a citizen of Florida.

20.     Defendant LGI Homes, Inc. is a Delaware corporation with its principal place of business at 1450 Lake Robbins Drive, Suite 430, The Woodlands, TX 77380.

21.     Defendant LGI Mortgage Solutions, LLC is a joint venture formed by LGI and loanDepot.com, a subsidiary of loanDepot, Inc. LGI and loanDepot formed LGI Mortgage in March 2021, organized under the laws of the State of Delaware and its principal places of business are at 800 N Scottsdale Rd, Ste 3800, Scottsdale, AZ 85251 and 800 N Scottsdale Rd, Ste 3800, Scottsdale, AZ 85251.

22.     Defendant loanDepot Inc. is a Delaware corporation with its principal place of business at 6561 Irvine Center Dr., Irvine, CA 92618.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(A) because it is a class action for a sum exceeding $5,000,000 exclusive of interest and costs, the classes have at least 100 members, and it is a class action in which the parties are minimally diverse.

24.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action is brought by Plaintiffs pursuant, *inter alia*, to the Truth in Lending Act, 28 U.S.C. § 1601 *et seq.*

25.     Personal jurisdiction is proper in this District under Florida Statute § 48.193. Defendants conduct substantial business in this District, maintain registered agents in this state, have sufficient contacts with this District, contracted with Plaintiffs and members of the Classes in Florida to apply Florida law to their agreements, and otherwise avail themselves of the markets in this District.

26.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c), specifically, because actions giving rise to this lawsuit occurred in Hernando County, Florida.

## FACTUAL ALLEGATIONS

### A.   LGI's Advertising Process is Deceptive and Manipulative at Every Step of the Way

#### 1.   LGI Uses Aggressive Marketing Tactics to Target Renters

27.   LGI is a homebuilding, sales, and marketing company that was founded in 2003. On November 7, 2013, LGI became a publicly traded company, listed on the NASDAQ. On its website, LGI states that it has built new homes in over 100 communities in 20 states. In 2024, LGI reported $2.2 billion in revenue from home sales, 6,028 closed homes, and an average sales price of $365,394. Florida is one of LGI's biggest markets. From 2020–2025, LGI sold 5,618 homes in Florida at an aggregate purchase price of over $2.7 billion, and an average purchase price of nearly $490,000 per house.

28.   As far back as its 2013 initial public offering ("IPO"), LGI has readily acknowledged—both publicly and internally—that it seeks growth primarily through aggressive sales and marketing practices, rather than by constructing and selling homes that offer superior quality or value. In LGI's Registration Statement, filed on Form S-1 with the SEC on August 28, 2013 (the "Registration Statement"), the Company touts its "unique sales approach" and stressed that it differentiates itself from competitors because, as opposed to other homebuilders, LGI "consistently and emphatically acknowledge[s] that 'We are a sales and marketing

company,' using extensive print and digital advertising to attract potential homebuyers."

29. In the Company's Annual Report for the year ended December 31, 2016, filed with the SEC on Form 10-K on March 7, 2017, LGI explained that its "primary objective is to establish direct communication between the prospective homebuyer and the salesperson," not with a potential customer's broker or advisor, and thereafter push the potential buyer to make "a buying decision on the first visit." Consistent with that approach, in the Company's Annual Report for the year ended December 31, 2013, filed with the SEC on Form 10-K on March 31, 2014 (the "2013 "10-K"), LGI states that it sends approximately 300,000 direct mail pieces per week to selected areas within a 25-mile radius of its active communities.

30. Similarly, in the Company's Annual Report for the year ended December 31, 2025, filed with the SEC on Form 10-K on February 20, 2026 (the "2025 10-K"), the Company explained that its "well-defined sales and marketing approach focuses on converting renters of apartments and single-family homes into homeowners" by using "extensive digital and print advertising" and "various marketing methods, such as digital marketing strategies, interactive online media, social media, directional signage, and billboards." Indeed, "[t]hese methods have proven highly successful [at] placing potential homebuyers in front of our trained sales professionals." And in its 2025 10-K, LGI reiterated that its "marketing efforts

are principally designed to connect directly with potential customers currently renting their residences and encourage them to schedule an in-person appointment[.]"

31. LGI admits that its marketing efforts specifically target renters. LGI's Professional Sales Action Training Manual ("Sales Manual") states that LGI's "business model is based on skillfully designing, building and selling high quality, entry-level homes in attractive locations that include well-designed floor plans with features targeted at current renters," and that LGI's "strategy focuses on converting renters of apartments and single-family homes into homeowners[.]"

32. Similarly, LGI Chief Executive Officer and Chairman Eric Lipar discussed on the December 5, 2022, episode of the "Zonda Home" podcast that LGI seeks to ensure that every community that it develops "has at least 50,000 rental units within 30 miles."

**2.     LGI Targets Renters from Economically Vulnerable Groups and Areas**

33. LGI utilizes a variety of media to advertise the homes it builds. Those media include (1) thousands of pieces of direct mail sent to apartment buildings or complexes in the general area of its developments; (2) billboards and other signage placed strategically; and (3) hundreds of concurrently running social media campaigns on platforms like Facebook, Craigslist, and TikTok. LGI's ads

13

typically emphasize low monthly payments and rent comparisons in large colorful fonts, conveying the overt or implicit representation that renters could own a home for the same monthly payment as their current rent.

34.     LGI also successfully targets economically vulnerable populations, including those in Section 8 housing. As one former LGI employee said, LGI routinely gets many customers from "lower income families . . . section 8," to whom any increases in monthly payments may be disastrous.

35.     As LGI tells its employees, the "bread and butter" of LGI's business is first-time homeowners who have never been through the homebuying process. These are exactly the people most likely to fall victim to LGI's deceptive marketing and sales practices.

**3.     LGI's Business Is Built on Aggressive and Misleading Marketing**

36.     Going back at least as far as its IPO in 2013, LGI readily admits that its business is focused on aggressive sales and marketing tactics at least as much as it is focused on the quality of its houses.

37.     LGI acknowledged in its Registration Statement that its sales tactics are effective at pulling in potential Homebuyers and generating sales revenues, stating that its "aggressive print advertising is extensive and effective in placing potential homebuyers in front of [its] highly trained sales professionals. . . . [its] advertising focuses on the core message of value and dream fulfillment."

Accordingly, as the Registration Statement further discusses, LGI's "focus on sales and marketing is a key driver of [its] high conversion rates." LGI's sales-first model is effective in attracting a specific clientele of renters and first-time homebuyers who are acutely unaware of mortgage escrow mechanics, property tax assessments, and long-term costs of homeownership.

38.    LGI's Registration Statement further explained:

> We believe our expertise in sales and marketing differentiates us from our public homebuilder peers. We have established a successful, unique marketing system that has proven to create a large volume of potential homebuyers. We make extensive use of advertising, including targeted direct-mail brochures, our website, social media, newspaper advertisements and the placement of strategically located signs and billboards, all of which are designed to encourage potential homebuyers to schedule an appointment to visit one of our active communicates. We reach most of our potential homebuyers through our direct marketing program specifically designed to target renters. Each week, we send an average of 12,000 direct mailings to renters within a 25-mile radius of each of our communities.

LGI also proudly admits that its sales and marketing is focused on promises of low monthly payments, including soliciting renters and pushing the message that monthly payments for the purchase of an LGI home will favorably compare to their existing monthly rent payments. As LGI stated in its Registration Statement, "Advertising monthly payment and focusing on phrases such as 'Tired of Paying Rent?', 'Own a new home for $799/mo principal and interest', 'NO Down Payment Required', and 'It's easy to qualify. Let us show you how…,' [LGI]

15

invite[s] people to fulfill their dream of home ownership by delivering a unique message that is relevant to [its] targeted potential homebuyers across all markets."

39.    LGI effectuates this strategy in part by training its sales staff extensively on the "LGI Way," an integrated set of strategies designed to maximize pressure, break down potential customers' resistance, and ultimately lead to a sale as quickly as possible at the highest possible price point.

40.    As LGI explained in the Company's 2013 Annual Report, its first as a public company (the "2013 10-K"), "By targeting renters, [it] reach[es] beyond traditional real estate advertising by employing sophisticated marketing techniques such as directional signage, billboards, direct mail, display and classified ads, social media and interactive online media to attract potential homebuyers and drive potential homebuyers to [its] sales centers across our markets. . . . [Its] marketing team is able to determine where the majority of renters live in the area, how much they are paying in rent, and the types of amenities that they have access to in their current living situation."

41.    According to one analysis, LGI also routinely charges more for its homes than other builders, selling its homes at an average 28% markup compared to new homes in the same neighborhood built by LGI's competitors.[2]

---

[2] *See* Hunterbrook Media, *Buyer's Remorse: How LGI Homes Lures Renters Into Buying Homes They Can't Afford*, https://hntrbrk.com/investigations/lgih (last visited July 27, 2026).

42.     By 2021 at the latest, LGI's focus on intensive marketing tactics and higher prices than market comparables stood in stark contrast to other similar homebuilders. By 2021 and continuing to the present, rising interest rates have forced many national homebuilders to lower prices or offer meaningful price concessions, in order to keep prospective Homebuyers' total out-of-pocket costs from ballooning beyond an affordable level. In contrast, LGI did the opposite: according to Hunterbrook Media, "[e]ven as other builders lowered their home prices amid soaring interest rates since 2021, LGI doubled down on marketing rather than reducing home prices."[3]

43.     In LGI's Annual Report for the year ended December 31, 2017, filed with the SEC on Form 10-K on February 27, 2018, LGI explained that "[e]ach new hire [to LGI's sales team] undergoes an extensive introductory training program before interacting with our potential homebuyers. This program consists of 30 days of initial in-depth, in-house education about our time proven selling strategies, including a two-week intense training program at our headquarters combined with an additional 70 days of secondary training at the local division."

---

[3] *See id.*

44.    LGI further explained in its 2013 Registration Statement that its training includes pushing its sales staff to ensure "a very short period between loan approval and closing":

> We sell homes through our own highly trained sales professionals with less than 10% of our sales since 2010 requiring commissions paid to third party realtors, which enhances our profitability and ensures a superior homebuyer experience. In addition, we provide potential homebuyers with a thorough outline of the steps to homeownership and educate them on the advantages homeownership offers compared to renting. Throughout our personalized sales process, our sales professionals learn about their customers' current housing situation and seek to understand their individual needs while educating them on our value proposition. Once potential homebuyers are pre-qualified, we share basic floor plans and price information and conduct tours of one to three homes at price points affordable to the potential homebuyer. As a result of this approach, our homebuyers generally experience a very short period between loan approval and closing[.]

45.    The Company further explains in its Sales Manual that its business model relies on avoiding realtors whenever possible, controlling the flow of information to potential Homebuyers and cutting out independent professionals who could protect customers' interests and ensure that LGI home sales are conducted in a fair, appropriate, transparent, legal manner.

46.    LGI also keeps close tabs on each of its salespeople, explaining in the Company's 2013 10-K that its customer relationship management ("CRM") system, "developed fully in-house, provides management with the tools to

continually monitor and measure the performance levels of every sales professional in each particular phase of the sales process."

47.    In sum, LGI emphasizes sales tactics designed to consummate sales as quickly as possible, cut off customers from advice, and leave almost no opportunity for diligence, questions, or explanations.

### 4.    LGI Advertises False Information about Home Prices to Attract Homebuyers

#### a.    LGI Advertises Deceptively Low Monthly Payments

48.    LGI's ads represent deceptively low monthly payments to potential buyers. The ads omit the costs of items such as taxes, insurance, HOA dues, and other fees that could add at least 30%, and as much as 70%, to the main purchase price, depending on the customer's down payment amount and the type of financing the customer uses.

49.    LGI has advertised homes for as low as around $1,500 a month when the true monthly price was $3,000, double the amount they advertised.



50.     For example, LGI has in the past disseminated advertisements offering homes for "$0 down" and monthly payments as low as $799 a month. In reality, on information and belief, there is no such house that LGI builds or sells. There is no combination of financing options that could simultaneously result in (a) no down payment; and (b) a monthly payment of $799/month. Public interviews with LGI sales agents instead reveal that monthly payments were typically 30–70% higher than the advertised price. This is in part because LGI's pricing conspicuously omits the costs of insurance, taxes, and HOA fees from the monthly price.






51.     According to the Hunterbrook Report, contrary to LGI, none of LGI's peers omit taxes, insurance, HOA dues, and other fees in their public marketing. Instead, as the below advertisement shows, homebuilders typically advertise using the total price of the home rather than the estimated monthly payment, and even when they do advertise monthly rates, they include taxes, insurance, and other fees in the calculation of those payments.



52.     As an example, a Hunterbrook Media reporter visited an LGI community in Poinciana, Florida, that LGI publicly advertised as offering houses for "$0 down" and "$1,599/mo." However, none of the financing the reporter was offered even came close to matching those terms. Instead, the least expensive offer

from LGI was $1,969.57 per month once taxes, insurance, and HOA fees were included, which was almost 30% over the advertised price. And as Hunterbrook Media reported, the advertised pricing was not reasonably available to LGI's targeted customers—certainly not at the "No Down Payment" terms LGI advertised. Rather, "[w]hen asked, the sales rep kindly explained that the only way to achieve the advertised price of $1,599/month is to put down $130,000– nearly 42% of the total sale price at the time." In other words, although the sales representative appears to have provided accurate pricing information, that information squarely contradicted LGI's marketing and advertisements, which nevertheless proved effective at bringing potential Homebuyers in the door.

23



53.     LGI's marketing is a prototypical "bait-and-switch" tactic designed to lure Homebuyers by advertising artificially low monthly payments ("Advertised

Monthly Payment") that the Company knows do not reflect the true cost of owning an LGI home. Moreover, in addition to advertising deceptively low monthly payments, LGI tells Homebuyers that their payment "won't get higher and higher each year" when in reality, taxes, insurance, and HOA fees inevitably *do* rise over the years for homeowners, increasing their overall monthly payment.



**The Value of Owning Your Home**

Curious about financing? LGI Homes will even calculate your monthly investment down to the penny - including taxes and homeowner dues. Why make the change from renting to owning? When you own, your financial investment goes toward an asset: a home that is yours. Your payment won't get higher and higher each year. No more money going down the drain! We are happy to offer multiple financing options through our preferred lenders, so we can find a monthly payment that works for your family and budget.

HNTR
BRK

54.   That is exactly what happened to Ms. Connelly. LGI did not tell Ms. Connelly that her payments would go up every year, and Ms. Connelly was unaware that they would. But invariably, they did.

> **b.    LGI Knows That Its Marketing Tactics Are False and Misleading**

55.   LGI's CEO Eric Lipar has described the Company to its employees as "really a sales and marketing company that sells houses." LGI's entire sales operation conforms to that description.

56.    LGI's sales offices functioned like "boiler rooms," with representatives racing against each other to secure leads, and working extended hours without breaks. As Hunterbrook Media's reporting confirmed, LGI expressly trained its employees to close deals despite any ethical concerns they had. Internal complaints about misleading buyers or harmful sales practices were routinely ignored.

57.    For example, as Hunterbrook Media reported, LGI aggressively pushed its salespeople while also working to sidestep or downplay concerns about the Company's sales practices. In one instance, LGI flew new sales recruits to Texas, hosted them at CEO Eric Lipar's home, and told them they were joining an elite group that would "make millions." Former employees expressed that their time at LGI led them to conclude none of this was true but rather was a skillful manipulation that LGI employed to incentivize employee compliance with LGI's sales practices.

58.    LGI employees knew that the numbers they were advertising to prospective buyers were false and intentionally misleading. One former LGI sales representative said that LGI prices "were always so far from reality."

59.    Another former LGI employee explained that LGI "send[s] flyers to any apartment complexes that are in the area . . . and try to get everybody in on

26

these low monthly payment promises, but they don't include . . . any property taxes . . . anything above principal and interest."

60.    LGI's advertising tactics were so deceptive that at least one of LGI's former sales representatives left the Company because the representative was uncomfortable with LGI's "bait-and-switch" marketing. Another sales employee left because, despite her repeated requests to management to bring the monthly prices advertised on LGI's website "close to reality," LGI never made the appropriate requested changes.

61.    LGI's ads for homes are designed to funnel shoppers into their sales offices where they are met with a high-pressure sales environment and false sense of urgency. According to the Hunterbrook Report, "one manager recalled being trained to first 'get them to trust you.' Then sales employees were told to go over their credit reports, review financials, and even offer advice such as telling customers to sell their car to boost their score," all in service of turning shoppers into buyers. The Company calls it "the LGI way."

62.    The Report also unearthed that LGI instructed its sales staff to place "SOLD" signs on homes that were not in fact sold, in order to manufacture urgency and create the false impression of rapidly disappearing inventory.

**B.**      **LGI's Sales Process Is Deceptive, Illegal, and Manipulative at Every Step of the Way**

63.      LGI uses numerous illegal, improper, and misleading sales tactics. These methods are dictated by the Company's senior management and detailed in LGI's Sales Manual, in which LGI provides employees with a step-by-step description of how the employees should talk to customers to gain sensitive financial information and so that LGI can quickly strongarm customers into signing home purchase contracts.

64.      According to the Sales Manual, once a potential customer comes to the LGI sales office, an LGI employee must take the following steps designed to close a home sale as quickly as possible, even when the terms of a prospective sale differ materially from advertised pricing figures or otherwise run counter to a prospective Homebuyer's particular circumstances: (1) have the potential customer fill out a welcome card; (2) build rapport with the potential customer; (3) open the potential customer's mind; (4) discuss six steps to the potential customer owning their new home; (5) discuss LGI's commitments and aspects of the potential new home; (6) run the potential customer's credit; (7) review the potential customer's mortgage qualifications; and (8) sell the house.

65.      The Sales Manual's first step—filling out a welcome card—entails a potential customer filing out a card with the customer's name, phone number, zip

code, address, and how the customer heard about LGI. The Sales Manual requires the sales associate to add the date, time, and extension number to the welcome card "immediately."

66. The second step in the Sales Manual requires the salesperson to "build rapport" with the potential customer. According to the Sales Manual, part of building rapport includes the sales associate asking "great questions" "to determine what the customer's dominant buying motive (DBM) is and what their wants vs. needs are."

67. The third step in the Sales Manual is opening the customer's mind. The Sales Manual requires the sales associate to "[e]xplain to the customer that [they] can help them and [they] have what they are looking for." Pursuant to the Sales Manual, regardless of the potential customer's wants and needs, the LGI sales associate is required to tell the potential customer that LGI either has "exactly what you are looking for" or "some options for you."

68. The fourth step in the Sales Manual is reviewing with the potential customer a separate set of six steps intended to "explain the home buying process and set the proper expectations for the customer." The Sales Manual instructs the sales associate to present poster boards with potential homes and to tell the potential customer, as they are setting up to present the poster boards, "Before we

29

go pick out your new home, I am going to share some valuable information with you here in the office."

69. The fifth step in the Sales Manual is discussing LGI's commitments and aspects of the potential new home with a potential customer. The Sales Manual defines LGI's commitments and core values as: customer service, integrity, ethical behavior, loyalty, efficient use of time and resources, and profitability. The Sales Manual requires the sales associate to disclose these commitments and purported perks and amenities to the potential customer.

70. The sixth through eighth steps in the Sales Manual are described below and include LGI employees running potential customers' credit checks and reviewing the potential customers' mortgage qualifications, despite LGI's salespeople not being accredited or certified credit counselors as federal law requires.

71. As explained below, these eight steps are misleading and coercive business practices that result in Homebuyers being "baited and switched" into paying substantially more for their homes than the amounts LGI represents in its sales and marketing materials.

**1.      LGI Makes Potential Customers Fill Out a Pre-Qualification Worksheet and Participate in Credit Checks Even Though LGI Employees Are not Licensed Mortgage Originators**

72.     Before LGI employees run customers' credit, the Sales Manual requires LGI employees to have potential clients fill out a pre-qualification worksheet, as seen below:

73.    The pre-qualification worksheet collects the potential customer's name, social security number, income, the address of the target home, the property's estimated value, and the proposed amount of a mortgage loan, the six elements of a mortgage application as defined by 12 CFR Part 1026 of Regulation Z.

74.    The Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act") states that to "take a residential mortgage application," such as LGI's pre-qualification worksheet, the individual must be licensed as a mortgage loan originator. On information and belief, LGI sales representatives are not licensed as mortgage loan originators.

75.    LGI's Sales Manual then requires LGI employees to run potential customers' credit after they have filled out a pre-qualification worksheet.

76.    It is not industry practice for a real estate agent to run a potential customer's credit. On information and belief, LGI sales representatives do not have licenses to pull potential customers' credit or to see their financials or handle qualifications as directed by LGI's Sales Manual.

77.    Using unlicensed employees to take information, including financial information such as a credit score, from potential borrowers is a violation of 12 CFR § 1026.36(f)(2) of Regulation Z for LGI.

32

78.    In addition, LGI does not allow potential customers to even step into their future home until after LGI improperly runs their credit reports.

79.    LGI employees were told not to give customers copies of the credit reports, and they would sometimes destroy the credit reports.

80.    LGI's employees were trained to sell homes to customers even when customers' credit scores were very low, even around 570, which is considered to be "Very Poor" by Experian.[4]

81.    One former LGI employee said that LGI is "running credit and approving pretty much anybody they can and then [customers] [are] falling out of contract later."

82.    The LGI Sales Manual even has a page titled "Review Mortgage Qualifications," as seen below, that requires LGI employees to act as mortgage loan originators despite their lack of licensing:

---

[4] Experian, *570 Credit Score: Is it Good or Bad?* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/570-credit-score/ (last visited July 27, 2026).

## *Review Mortgage Qualifications*

The New Home Consultant is to complete the pre-qualification worksheet *with* the customer by asking questions and filling in the customer's response. Once this is completed *and* signed by the customer, go to the boiler room and pull their credit (single bureau only).

In the boiler room, calculate front & back ratios using the target home payment to determine if the customer can qualify for the target home today.

Scenario #1: Customer can qualify for the target home today

- Add the other 2 bureaus to the credit report

- Re-calculate the ratios based on the tri-merged credit report. We do this to determine what home(s) the customer can qualify for

- Go back to the table and tell the customer **"Congratulations! You are pre-qualified".** Review the pre-qualification worksheet and credit report with the customer (draw out and explain the TEE-PEE on the back of the pre-qualification worksheet to the customer) *see page 64*

- Suggest to the customer to move on to Step 3 **"I suggest we move on to step 3 and go pick out your brand new home here at _____."**

Scenario #2: Customer does not qualify for the target home today

- Give the customer advice on what they need to do to be able to purchase a home in the future

### We only pull a tri-merged credit report on customers that qualify to purchase the target home TODAY.

*If a customer claims to be pre-qualified for a brand new home, we recommend asking the following questions:

1. What bank/mortgage company are you prequalified through?
2. When were you pre-qualified?
3. How much are you pre-qualified for?

**2.      LGI Makes Potential Customers Participate in Credit Counseling Even Though LGI Is Not Accredited or Certified to Provide Credit Counseling**

83.      According to a former LGI sales manager, it is common practice for LGI employees to put customers in contract for homes even if the customers were

34

not pre-qualified. LGI employees recommend credit counseling to push those customers through the sale.

84.    On information and belief, LGI employees are not accredited or certified to provide credit counseling.

85.    The Credit Repair Organizations Act, 15 U.S.C. § 1679d, requires organizations to enter into a written and dated contract signed by a consumer before providing credit repair services. LGI does not enter into any such contract with potential customers.

86.    If customers are not pre-qualified, LGI employees are trained to suggest that customers apply for a CreditWise credit card or a First Premier credit card and to instruct customers to work on their credit.

87.    The First Premier Credit Card has "some of the highest interest rates in the industry" and charges three different types of fees.[5] But the LGI Sales Manual does not mention or require that LGI employees provide information about those high costs to potential customers.

88.    LGI's Sales Manual instead directs LGI employees to recommend a First Premier credit card to any potential customer that needs to "establish credit" or "increase their credit score," as seen below:

---

[5] NerdWallet, *First Premier Credit Card Review: Bad Option for Bad Credit*, https://www.nerdwallet.com/credit-cards/learn/first-premier-bank-credit-card-review (last visited July 27, 2026).



# First Premier Credit Card

The First Premier credit card is what we recommend to any customer that needs to establish credit or to any customer that does not have any revolving credit and needs to increase their credit score. We recommend this credit card because it reports to all 3 bureaus within 10 days of being approved. Other credit cards can take anywhere from 30 to 90 days to report to the credit bureaus.

Follow the procedures below when a customer has no revolving credit and needs 50 points or less in order to obtain a mortgage (credit scoring in not an exact science but we have seen scores increase from 0 to 50 points with this scenario):

- Customer calls or goes online to order and pay for credit card
- LGI Sales Manager/New Home Consultant calls First Premier at 800.987.5521 to verify card has been approved (call the day after the customer ordered and paid for the credit card)
- Credit card will appear on customer's credit report 10 calendar days after approval date
- Customers must sign and date a new pre-qualification worksheet giving LGI permission to re-pull their credit
- LGI Sales Manager calls Factual Data to unlock customer credit report if we are re-pulling credit within 30 days of previous report (call 800#, need to give customers name and SS# from existing credit report, ask Factual Data to unlock all 3 bureaus)
- LGI Sales Manager/New Home Consultant re-pulls customer's credit report 10 calendar days after approval date

89. A former LGI employee said that LGI employees would specifically instruct potential customers on how to improve their credit by instructing them to

36

pay off certain bills or loans and then telling potential customers that that they would rerun their credit in the next 30 days.

90.   A former manager estimated that more than 70% of LGI's leads enrolled in a "credit remediation program" because of their "questionable" credit.

91.   Despite not being accredited or certified credit counselors, LGI employees reach out to customers with low credit twice a month to ask them about their credit scores.

### 3.   LGI Gives Potential Customers Deeply Misleading Information about Monthly Payments

92.   Potential LGI customers are shown a diagram that gives a deeply misleading impression of affordability by omitting multiple costs that LGI is aware of but potential customers are not.

93.   LGI's Sales Manual requires LGI employees to draw the below diagram for potential customers:



37

94.     When estimating a total monthly home payment, the Consumer Finance Protection Bureau instructs customers to include principal and interest, mortgage insurance, property taxes, homeowner's insurance, and homeowner's association or condominium fees.

95.     Like LGI's advertisements, however, the diagram LGI employees are required to draw for potential customers does not account for federal and state income taxes, Social Security and Medicare taxes, retirement contributions, and other fixed expenses like insurance, HOA fees, and utility bills.

**4.      LGI Employees Engage in Deceptive and Manipulative Sales Practices**

96.     By the time a prospective buyer reaches the sales office, LGI's deception extends itself into downright predatory sales tactics. Those practices have been refined, standardized, and widely enforced per LGI's Sales Manual. Additionally, LGI's Sales Manual requires employees to use, *inter alia*, the following deceptive and often illegal practices:

a.     Intentionally using statements and other high-pressure tactics to create urgency to buy a home regardless of whether those statements are true;

b.     Following customers when they go to get a cashier's check; and

c.     Requiring customers to drive in LGI's employees' vehicles to see houses instead of their own vehicles. LGI instructs its agents that, if a customer refuses to ride with the sales agent or allow the agent to drive their vehicle, the agent must deny that customer access to the homes altogether.

97.    Part of LGI's training of its employees is training employees to "not take no for an answer" from a customer and to use whatever means necessary to convince customers to purchase a home.

98.    LGI told Ms. Connelly when she came into the LGI sales office that the LGI houses were selling fast and that LGI would "take care of everything."

99.    The coercive nature of LGI's sales tactics is directly intertwined with its high-performance culture, encouraged by CEO Eric Lipar. For example, a former employee said that sales representatives at LGI were expected to convince 20% of shoppers to purchase a home on their first visit.

100.    Former LGI employees have said that LGI's sales tactics are "deceitful" in a "car salesman-like office" where they "take advantage of people who don't know better."

101.    LGI's practices surrounding customers' credit scores and credit reports made at least one LGI sales manager so uncomfortable that he informed other salespeople that he was uncomfortable and that he was looking to work elsewhere because of his discomfort with LGI's practices.

102.    As Hunterbrook Media reported, LGI sales agents routinely ran credit on buyers with scores in the 500s and were trained to push contracts through regardless, knowing many would ultimately fail to close or face foreclosure.

103. One former LGI employee said that at LGI there is "an atmosphere where people are so desperate for income, they're willing to do pretty much anything to survive, even if it means selling a house to somebody who . . . is going to get foreclosed on probably in the next year."

104. Another former LGI employee said that LGI has a "high . . . foreclosure rate because . . . all of these people are in over their heads and we . . . sell them a home and regardless of [if] it's going to make them mortgage broke."

105. As Hunterbrook Media's investigation found, foreclosure rates among LGI buyers were approximately "four times the national average for comparable mortgage borrowers," an outcome former employees described as predictable and baked into LGI's sales model.

106. The Sales Manual even includes a section on "Buyer's Remorse," instructing sales agents to normalize panic after contract signing and redirect conversations away from the home itself, by talking about kids, the weather, or even offering jellybeans that are referred to internally as "buyer's remorse pills."



**Buyer's Remorse**

Hand the customer a jar of "Buyer's Remorse" pills.

"Many times when people make a decision to purchase something major such as a home it is not uncommon to get an uncomfortable feeling about that decision. They start to question, "What are we doing?", "What have we done?", and "Are we making the right decision?" That's called "Buyer's Remorse". Just remember, those feelings are normal. In fact it would be unusual if you didn't have some of those feelings. If and when that happens, just think about all the great things that you are going to be providing for you and your family, why you chose _____ and the benefits that come with home ownership; and take two of these pills. That uncomfortable feeling usually starts to go away. We offer free refills and the green pills are extra strength. But be sure to call me. Many times it may just be that more questions need to be answered for you. Let me make a suggestion - although we've covered a lot of information today, questions may come to your mind on your way home that we didn't discuss. Write them down and I'll call you this evening. That way I'll be able to answer them for you. Why don't I call you around _____?"

HNTR BRK

107.  LGI's focus on selling homes, despite a high foreclosure rate or customers' low credit, stems from LGI's need to create an appearance of strong business performance in the form of net orders. As Hunterbrook Media reported, in LGI's most recent earnings call on November 4, 2025, CEO Eric Lipar emphasized a 44% year-over-year increase in net orders even though sales had fallen 39.4%. Net orders account for all purchase agreements signed and do not account for homes that actually closed. During that same November 4, 2025, earnings call, Lipar admitted that loan ineligibility of buyers was the key reason for difficulties in closing the sales.

108.  LGI employees use deceptive and forceful sales tactics to pressure customers to sign purchase agreements. For example, on the day Plaintiff Wilson

was set to sign his purchase agreement, he was sick and told LGI that he could not drive to the office to sign the purchase agreement. The LGI employee with whom Mr. Wilson spoke insisted that Mr. Wilson come to the office that day to sign the purchase agreement, falsely making the situation seem urgent, and refused to answer Mr. Wilson's questions about the price of the home.

109. LGI goes to great lengths to prevent public disclosure of its illegal and deceptive sales tactics. For example, when LGI employees, including managers, leave the Company, they receive a certified letter from LGI's CEO telling the former employees that they must return the employee handbook, which has each individual employee's name printed on top, to LGI or risk retaliation by LGI. Additionally, many LGI employees also were required to sign nondisclosure agreements.

## C. LGI, LoanDepot, and LGI Mortgage Work Together to Carry Out Their Fraudulent Scheme

110. LGI pairs its deceptive and coercive sales tactics with an equally predatory financing system. That system is predicated on LGI's partnership with Defendant loanDepot, a non-bank, direct national mortgage lender that provides customers with various home financing options, including purchase loans, refinancing, and conventional mortgages.

43

111. LGI and loanDepot operate a joint venture, LGI Mortgage, which they formed in 2021.

112. LGI stridently insists that sales agents do everything in their power to force customers to use LGI Mortgage for financing. The Sales Manual explains that:

> LGI arranges financing for our home sales through a joint venture with loanDepot called LGI Mortgage Solutions. This joint venture was formed in 2021 and offers competitive rates with minimal closing costs for our customers. The goal is to achieve a 90.0% capture rate.

113. Each side brings something to the table for the joint venture: LGI provides a captive set of customers, in need of financing and deliberately cut off from fully understanding their options. LoanDepot provides the financing itself, as well as the knowledge and expertise to navigate the highly regulated world of mortgage lending. Defendants act in concert, through the LGI Mortgage joint venture, to effectuate the "bait-and-switch" scheme at the heart of their business.

114. When LGI and loanDepot launched LGI Mortgage in March 2021, loanDepot publicly stressed that it had been "a preferred lender with LGI Homes since 2015," while LGI touted "[t]he seamless borrowing experience offered by loanDepot." In November 2021, Defendants announced that LGI Mortgage was expanding into numerous additional states, such that "LGI Mortgage Solutions also expands loanDepot's footprint in the purchase mortgage market and is an

44

important part of the company's unique channel diversification strategy," with LGI lauding the "homebuying experience from first visit through loan close" that flowed from LGI's "[w]orking exclusively with loanDepot through this joint venture."

115. LGI's Sales Manual offers four justifications for why it asks sales agents to pressure customers into using LGI Mortgage: (1) Control the Transaction; (2) Control the Customer Experience; (3) Save the Customer Money; (4) Everyone gets paid on time.

116. As described in the Sales Manual and detailed below, the first two of these provide the real rationale for LGI's tactics: it wants to control all information its customers receive in order to prevent those customers from realizing the extent to which they are being scammed.

1. **Once Prospective Homebuyers Are Interested in a Property, LGI and LoanDepot Prepare Misleading Estimates that Do Not Include the True Monthly Cost**

117. Through the LGI Mortgage joint venture, loanDepot is part and parcel of the "bait and switch" scam LGI is running on its customers.

118. When the prospective Homebuyer decides to move forward with the homebuying process, LGI sales agents refer them to LGI Mortgage.

119. LGI management instructs its employees to actively steer customers away from using third-party lenders to instead pressure them to use LGI Mortgage.

120. On information and belief, LGI has insisted on Homebuyers using loanDepot rather than the Homebuyers' preexisting broker or bank.

**2. LGI and LoanDepot, Acting Through LGI Mortgage, Operate an Opaque Lending and Homebuying Process that Allows them to Hide Their Unfair and Deceptive Practices**

121. LGI and loanDepot, working together through LGI Mortgage, complete the uniform disclosures and other legally required closing documents. Defendants communicate the true monthly payment ("Real Monthly Payment") to the Homebuyer through mail and wires:

a. First, the Homebuyer, together with LGI Mortgage (or loanDepot), completes a loan application, providing detailed financial information. Shortly thereafter, the lender runs credit checks and reviews the application. If lending standards are met, the lender pre-approves the Homebuyer for the loan.

b. Second, LGI Mortgage (or loanDepot) prepares and provides the Homebuyer with a "Loan Estimate." The lender obtains information from LGI to prepare the initial Loan Estimate. An excerpt from an exemplar Loan Estimate appears below:

| Projected Payments | | |
|---|---|---|
| Payment Calculation | | Years 1-30 |
| Principal & Interest | | $2,134.36 |
| Mortgage Insurance | + | 0 |
| Estimated Escrow
*Amount can increase over time* | + | 422 |
| Estimated Total
Monthly Payment | | $2,556 |

| Estimated Taxes, Insurance & Assessments
*Amount can increase over time* | $447
Monthly | This estimate includes | In escrow? |
|---|---|---|---|
| | | ☒ Property Taxes | YES |
| | | ☒ Homeowner's Insurance | YES |
| | | ☒ Other: HOA Dues | NO |
| | | *See Section G on page 2 for escrowed property costs. You must pay for other property costs separately.* | |

Defendants intend for the prospective Homebuyer to rely on the "Estimated Total Monthly Payment" amount, which is substantially higher than the Advertised Monthly Payment with which LGI had originally enticed the customer, and on which the customer relied. Further, while the Loan Estimate states in small print that "[y]ou must pay for other property costs separately," Defendants do not disclose what those costs are or may be at this stage.

c.   Third, loanDepot sends many more additional documents to review and sign to move forward with the loan and home purchase.

d.   Fourth, in between loan approval and closing, loanDepot often provides Homebuyers with additional disclosures. Those additional, and some new, disclosures include: the escrowed property costs over year 1 (which consists of Hazard Insurance, Mortgage Insurance, and County Property Taxes), the non-escrowed property costs over year 1 (which consists of the Homeowner Association Dues), the initial escrow payment, and the monthly escrow payment. Only at this stage does the Homebuyer see all of the escrowed and non-escrowed property costs owed over year 1. Although the additional disclosures also state in the category of non-escrowed property costs over year 1 that "You may have other property costs," the additional disclosures do not explain or disclose what does "other property costs" are.

e.   Fifth, after approving the loan, loanDepot arranges a real estate closing to finalize the deal. LoanDepot also creates an escrow account using the Real Monthly Payment for the upcoming year.

47

**3. At the Last Minute, Defendants Pressure Homebuyers to Take on Higher-Than-Advertised Monthly Payments**

122. Defendants convey the Real Monthly Payment to Homebuyers in loan estimates and documents only after the Homebuyers sign a purchase agreement with LGI and submit a <u>nonrefundable</u> $1,000 deposit to LGI.

123. For example, one Homebuyer signed a purchase agreement through Docusign with LGI on March 13, 2024, and made a $1,000 deposit towards the home, and received the loan estimate with the Real Monthly Payment on May 9, 2024. LoanDepot knew that the Homebuyer put down a deposit before Defendants provided the Homebuyer with the higher-than-advertised Real Monthly Payment.

124. By the time Homebuyers receive the Real Monthly Payment, they have already committed to buying a home with LGI – rendering it economically, psychologically, and practically arduous to withdraw or rescind their purchase agreement with LGI. Reams of social science research, along with legal precedent, confirm the extreme difficulty of a consumer extricating themselves from such a "bait-and-switch" scenario.

**4. Defendants Insist that Homebuyers Finance their Home Purchases with LoanDepot and Improperly Insert Unenforceable Arbitration and Class-Action-Waiver Clauses in Mortgage Contracts**

125. As discussed above, as part of their improper, high-pressure sales tactics, Defendants regularly insisted that Homebuyers could not work with their

48

own agents and brokers. They were instead forced to work solely with representatives from LGI and loanDepot.

126. Many of the Purchase Agreements that Plaintiffs and Class Members entered into with Defendants included clauses purporting to require arbitration of claims concerning Plaintiffs' and Class Members' home purchases and to waive Class Members' rights to pursue claims on a Class-wide basis.

127. Those improper provisions are not enforceable and do not affect Plaintiffs' and the Classes' claims here. Under the Truth in Lending Act, "No residential mortgage loan . . . may include terms which require arbitration," 15 U.S.C. § 1639c(e)(1), and "No provision of any residential mortgage loan," or any "other agreement . . . relating to the residential mortgage loan," "shall be applied so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other court of competent jurisdiction," 15 U.S.C. § 1639c(e)(3). Class Members' agreements with Defendants, whether for Homebuyers' purchases or financing transactions, are agreements "relating to the residential mortgage loan."

128. Additionally, although Homebuyers' Purchase Agreements with LGI contain a delegation clause to arbitration, the Mortgage Rules/Agreement that Homebuyers, including Mr. Wilson, signed with loanDepot does not contain an arbitration clause. Instead, that agreement discusses the parties utilizing only the

49

courts, including that: (1) the Governing Law is listed as federal law and the law of the state of Florida; ( (2) the Lender may foreclose the Security Instrument by judicial proceeding in the event of an uncured default; and (3) the Borrower waives any right to a trial by jury in any action, proceeding, claim, or counterclaim related to the Note or Security Instrument. The Mortgage Rules/Agreement sends any disputes, including potential arbitrability disputes, to the courts.

129.   Moreover, the delegation clause in the Purchase Agreements is itself specifically unenforceable. The delegation provision was procured through the same procedurally unconscionable process described above and throughout the Complaint: it was buried in adhesive form contracts presented to unsophisticated first-time homebuyers who were rushed to sign, denied answers to their questions, denied independent representation, and pressured with false urgency. And the delegation provision is substantively unconscionable on its own terms, because the arbitration provision's oppressive conditions apply with full force to the threshold arbitrability disputes the delegation provision purports to cover: a Homebuyer seeking merely to *contest arbitrability* must (a) split the arbitration provider's administrative and arbitrator fees equally, imposing costs prohibitive relative to the Homebuyer's claims; (b) submit to an arbitration provider selected unilaterally by the Seller *after* the dispute arises; (c) pay upfront fees immediately, with time "strictly of the essence"; and (d) forgo statutory fee-shifting "even if

otherwise allowed by statute." A provision that erects such prohibitive financial barriers between a consumer and the mere determination of whether the consumer must arbitrate is unconscionable under Florida law and unenforceable under the savings clause of 9 U.S.C. § 2.

130.   Precluding the Classes' claims here would dramatically undermine the Florida Deceptive and Unfair Trade Practices Act's ("FDUTPA") enforcement mechanisms and defeat the remedial purpose of the FDUTPA.

## D.   **Plaintiffs' Purchases with Defendants**

### 1.   **Ms. Connelly**

131.   In the beginning of 2024, Ms. Connelly was living in an apartment in Florida.

132.   Beginning in or around 2018, LGI sent Ms. Connelly via U.S. mail approximately five or more postcards or mailers advertising homes each month. The mail Ms. Connelly received from LGI advertised, *inter alia*: homes with monthly mortgage payments lower than monthly rental payments, homes that would cost $900 a month, and homes that would cost $1,900 a month.

133.   Based on the representations LGI made in those communications concerning the low monthly cost of purchasing a home from LGI, Ms. Connelly was drawn to LGI and became interested in purchasing a home from LGI.

134.    In June 2024 Ms. Connelly contacted LGI and went to LGI's sales office in Florida.

135.    When Ms. Connelly first went to the LGI sales office, an LGI salesperson showed her multiple homes and ran Ms. Connelly's credit.

136.    The LGI salesperson Ms. Connelly worked with repeatedly told Ms. Connelly that the homes were selling fast and that LGI would take care of everything related to the sale "in house."

137.    Ms. Connelly believed both the prices quoted in LGI advertising and the LGI salesperson's statements about homes "selling fast." Relying on those representations, which LGI knew at the time were false, Ms. Connelly committed to the process of buying a home with LGI by putting down a nonrefundable $1,000 deposit that same day.

138.    After putting down her deposit, Ms. Connelly told the LGI salesperson that she would like to keep her total monthly payments below $2,000, as LGI had advertised. In response, the LGI salesperson told Ms. Connelly that she should work more, possibly as a driver for Lyft or Uber (which Ms. Connelly had already been doing) to supplement her income. It was only after Ms. Connelly put down a <u>nonrefundable</u> deposit that the LGI salesperson mentioned any extra, monthly fees.

139. Additionally, immediately after Ms. Connelly put down her nonrefundable deposit with LGI and signed a purchase agreement with LGI, LGI put Ms. Connelly in contact with LGI Mortgage. LGI did not allow Ms. Connelly reasonable time to work with or find another mortgage provider.

140. LoanDepot also ran Ms. Connelly's credit. The loanDepot officers told Ms. Connelly she should pay bills to boost her credit score and pressured Ms. Connelly to resume repayment of her student loans, even though Ms. Connelly had secured forbearance from the government. LoanDepot told Ms. Connelly that her student loans would "hold up" her mortgage loan. Because Ms. Connelly believed what Defendants had told her and did not want to lose a home that was selling fast, she convinced her mother to cosign her mortgage loan.

141. LoanDepot provided Ms. Connelly with many documents including, *inter alia*, a Loan Estimate, Closing Disclosure, HUD Addendum, Escrow Analysis, and a Uniform Residential Loan Application.

142. Ms. Connelly filled out and signed the Uniform Residential Loan Application on September 16, 2024.

143. In 2024, Ms. Connelly's monthly payment, excluding HOA fees, was $2,418, which she submitted through loanDepot's online portal. Despite LGI's representation that monthly housing costs would not increase, that amount was

approximately 27% higher than LGI's Advertised Price that enticed Ms. Connelly to visit LGI's sales office.

144.   In 2026, Ms. Connelly's monthly payment, excluding HOA fees, is $2,700, due in part to Ms. Connelly falling behind on payments, but also due in part to an increase in the cost of her home insurance. That amount is approximately *43%* higher than the Advertised Price that enticed Ms. Connelly to visit LGI's sales office, despite LGI's representation that monthly housing costs would not increase.

145.   LGI concealed from and misrepresented to Ms. Connelly the possibility that her HOA fees would increase. Those fees have risen by 44% since Ms. Connelly purchased her house.

### 2.   Mr. Wilson

146.   Mr. Wilson is a disabled veteran who served in the military from 2010 to 2018 as a medic. As part of his service, Mr. Wilson was deployed to Afghanistan, and was also stationed in Colorado, Texas, and Georgia. Prior to buying a home from LGI, Mr. Wilson lived in a rented apartment for five years.

147.   Mr. Wilson became aware of LGI through online advertising. He saw LGI advertisements that listed houses for purchase with no down payment required. Based on LGI's advertisements, Mr. Wilson believed that he would finally be able to afford to buy a home.

148. After Mr. Wilson clicked on certain links within LGI's website, an LGI salesperson contacted Mr. Wilson via text message. The LGI salesperson asked Mr. Wilson to come to an LGI sales office in Florida.

149. When Mr. Wison first went to the LGI sales office, the LGI salesperson told Mr. Wilson that, as a disabled veteran, he would be able to buy a brand new house for $300,000.

150. LGI ran Mr. Wilson's credit when he first went to the LGI sales office.

151. The LGI salesperson told Mr. Wilson that he would have to pay approximately $50 in HOA fees and that the HOA fees would not change.

152. Immediately after Mr. Wilson put down a nonrefundable $1,000 deposit with LGI and signed a purchase agreement with LGI, LGI directed Mr. Wilson to loanDepot for financing, despite the fact that Mr. Wilson wanted to explore obtaining a VA home loan that likely would have been cheaper.

153. LoanDepot provided Mr. Wilson with several documents including, *inter alia*, a Loan Estimate, Closing Disclosure, HUD Addendum, Escrow Analysis, and a Uniform Residential Loan Application that included additional payments not included in the advertisements on which Mr. Wilson had relied.

154. Mr. Wilson filled out and signed the Uniform Residential Loan Application in December 2023.

155. The day of Mr. Wilson's closing, Mr. Wilson felt ill and told LGI that he did not want to drive to the LGI sales office for the closing because he was sick. The LGI agent told Mr. Wilson that he had to show up that day to sign the documents and that there was no other day that would work. On information and belief, that was false and or misleading.

156. Mr. Wilson paid a down payment totaling $2,000 in addition to his $1,000 deposit.

157. In 2024, Mr. Wilson's monthly payment, excluding HOA fees, was $2,126, which Mr. Wilson submitted through loanDepot's online portal. LGI concealed from Mr. Wilson the possibility that his HOA fees would increase. Those fees too have risen by 44% since he purchased his house.

## CLASS ACTION ALLEGATIONS

### A.   The Classes

158. Plaintiffs bring this case on behalf of themselves, and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Classes (the "Classes") are defined as follows:

> **Purchase Class:** All individuals in Florida who, between three years prior to the filing of the Complaint and the present (the "*Class Period*"), purchased a home from LGI.

> **Financing Class:** All individuals in Florida who, during the Class Period, purchased a home from LGI with a loan originated by loanDepot Inc. or LGI Mortgage Solutions, LLC.

159. Expressly excluded from the Classes are:

a. Any Judge or Magistrate Judge presiding over this action and members of their immediate families;

b. Defendants and their immediate families, directors and officers of LGI and their immediate families, and affiliates of LGI, including any entities in which Defendants have a controlling interest, or that have a controlling interest in LGI; and

c. All persons who properly execute and file a timely request for exclusion from the Classes.

160. Plaintiffs reserve the right to amend the definition of the Classes at the Class Certification stage of the litigation if further investigation and discovery indicates that the definition of the Classes should be narrowed, expended, or otherwise modified.

## B. Federal Rule of Civil Procedure 23(a) Criteria

### 1. Numerosity

161. The members of the Classes are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Although the exact number of members of the Classes is unknown, LGI's publicly reported sales figures show the numerosity of the Classes, which includes several thousand members or more. In LGI's Annual Report for the year ended December 31, 2025, filed with the SEC on Form 10-K on February 19, 2026, LGI reports 4,685 home closings in 2025, 6,028 home closings in 2024, and 6,729 home closings in 2023; in

the Company's Annual Report for the year ended December 31, 2022, filed with the SEC on Form 10-K on February 21, 2023, LGI reports 6,621 home closings in 2022; and in the Company's Annual Report for the year ended December 31, 2021, filed with the SEC on Form 10-K on February 15, 2022, LGI reports 10,442 home closings in 2021.

162. Due to the number of closings Defendants conduct annually in Florida, the number Class Members is expected to be in the thousands.

163. Thus, the Classes are so numerous that joinder of all members is impracticable.

### 2.    Commonality

164. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact affect the rights of each Class Member, and common relief by way of damages is sought for Plaintiffs and Class Members.

165. Questions of law and fact common to Class Members, which predominate over questions that may affect individual Class Members, include:

   a.    whether Defendants' scheme constitutes a violation of Florida Deceptive and Unfair Trade Practices Act;

   b.    whether Defendants committed fraud;

   c.    whether Defendants committed negligent misrepresentation;

d.      whether Defendants' scheme included violating the Truth in Lending Act; and

e.      whether Defendants' scheme misled the Classes into purchasing their homes.

166.    In the alternative, Plaintiffs seek certification under Federal Rule of Civil Procedure 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

### 3.    Typicality

167.    The claims and defenses of Plaintiffs are typical of the claims and defenses of the Classes because Plaintiffs were subjected to the same advertising and sales practices, as implemented and enforced through Company-wide training, including without limitation in LGI's Sales Manual, and were subject to the same high-pressure sales tactics and false and misleading representations concerning home ownership costs, as the other members of the Classes.

### 4.    Adequacy of Representation

168.    Plaintiffs will fairly and adequately assert and protect the interests of the Classes.

169.    First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims across the United States, and who will adequately represent the interests of the Classes.

59

170.   Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent.

171.   Further, Plaintiffs understand their obligations to the Classes, are committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Classes.

C.   **Federal Rule of Civil Procedure 23(b)(3) Criteria**

172.   The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation.

173.   Although the Classes are numerous enough to meet the numerosity requirement, the proposed Classes do not create manageability problems because the claims turn on common legal determinations. There are no legal or factual issues that would create manageability problems, as the issues turn on Defendants' conduct as implemented and enforced through Company-wide training, and members of the Classes each suffered the same harm, i.e., purchasing homes for higher than represented costs as a result of Defendants' high-pressure sales tactics.

174. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable, and prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

175. Despite the sizeable sum of money that Defendants unlawfully collected and retained, the damages suffered by some individual Class Members may be small relative to the burden and expense of individual litigation, making it impractical or practically impossible for such Class Members to individually redress the wrongs done to them. The issues that this litigation raises are complex, and any individual Class Member's recovery is small in relation to the amount of effort, cost, and expertise necessary to obtain said recovery.

176. Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using their business records.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Violation**
**(On Behalf of Plaintiffs and the Classes Against All Defendants)**

177. Plaintiffs reallege and incorporate by reference Paragraphs 1–176 as if fully set forth herein.

178.    Plaintiffs and Class Members are "consumers" within the meaning of Florida Stat. § 501.203(7).

179.    LGI is not licensed, certified, or registered pursuant to Chapter 475 Florida Statutes. The exemption set forth in Fla. Stat. § 501.212(6) therefore does not apply to LGI's conduct alleged herein.

180.    LoanDepot is not licensed, certified, or registered pursuant to Chapter 475 Florida Statutes. The exemption set forth in Fla. Stat. § 501.212(6) therefore does not apply to LGI's conduct alleged herein.

181.    LGI Mortgage is not licensed, certified, or registered pursuant to Chapter 475 Florida Statutes. The exemption set forth in Fla. Stat. § 501.212(6) therefore does not apply to LGI's conduct alleged herein.

182.    Defendants were engaged in trade or commerce within the meaning of Fla. Stat. § 501.203(8) throughout the Class Period.

183.    Defendants baited Plaintiffs and Class Members into seeking to purchase homes from LGI by advertising a monthly price and sale conditions that Defendants knew were false and misleading.

184.    Defendants had no intention of actually selling houses to Plaintiffs and Class Members on the terms offered. Defendants implemented the "switch" part of their scheme—informing Plaintiffs and Class Members of the Real Monthly

Cost of their homes—only after they had signed paperwork and put down deposits.

185. In addition to the false and misleading advertisements and representations described above, Defendants engaged in a series of unfair, deceptive, and manipulative business practices in connection with the marketing, sale, and financing of LGI homes. As alleged above, and among other things, Defendants: subjected Plaintiffs and Class Members to high-pressure sales tactics designed to rush them into purchasing homes before they could evaluate the homes' true cost; required them to undergo credit checks and credit counseling conducted by LGI personnel who on information and belief were neither licensed mortgage originators nor accredited to provide such counseling, in violation of federal law; concealed and misrepresented the true monthly cost of homeownership at each stage of the sales-and-financing process; and steered Homebuyers to loanDepot and LGI Mortgage for financing in order to control the transaction and foreclose independent scrutiny, while burdening Homebuyers with additional, undisclosed fees and costs. These deceptive and unfair business practices, separate and apart from Defendants' false advertising, misled Plaintiffs and Class Members into purchasing homes on terms materially less favorable than Defendants represented.

186. Plaintiffs and Class Members would not have entered into these transactions but for Defendants' misrepresentations and misleading business practices.

187. Defendants' false and misleading advertisements and business practices described above constituted unfair and deceptive acts and practices in the conduct of trade or commerce, prohibited by Fla. Stat. § 501.204(1). Each such act and practice was likely to deceive a consumer acting reasonably in the same circumstances, to that consumer's detriment.

188. Defendants knowingly and willingly committed these unfair and/or deceptive acts and practices for their own profit.

189. As a direct and proximate result of Defendants' misconduct, Plaintiffs and the Classes were injured. The amount of damage is to be determined at trial but is in excess of $5,000,000.

## SECOND CAUSE OF ACTION

### Fraud
**(On Behalf of Plaintiffs and the Classes Against All Defendants)**

190. Plaintiffs reallege and incorporate by reference Paragraphs 1–176 as if fully set forth herein.

191. Defendants misrepresented the cost of the homes in their advertisements and loan documents and concealed details about the homes.

192. The acts of fraud include each of the transmissions designed to induce Plaintiffs and the Classes to enter the home sales and financing transactions with Defendants that did not conform with industry practices, borrower expectations, or FHA requirements. The precise details of the various acts of fraud are set forth in Paragraphs 131–145 (Ms. Connelly) and 146–157 (Mr. Wilson).

193. Defendants had the intent to defraud Plaintiffs when LGI issued advertisements that misrepresented the cost of the homes, as set forth in Paragraphs 132–133 (Ms. Connelly) and 147–148 (Mr. Wilson), and when Defendants issued documents that misrepresented the cost of the homes, as set forth in Paragraphs 53, 141-145 (Ms. Connelly) and 16, 153–157 (Mr. Wilson).

194. Plaintiffs relied on Defendants' false statements and their reliance was justifiable.

195. Plaintiffs have been damaged by Defendants' misrepresentations because they have lost money after relying on Defendants' misrepresentations. The amount of damage is to be determined at trial but in the aggregate is in excess of $5,000,000.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation
### (On Behalf of Plaintiffs and the Classes Against All Defendants)

196. Plaintiffs reallege and incorporate by reference Paragraphs 1–176 as if fully set forth herein.

65

197.   Defendants misrepresented the price of the homes LGI sold, which is a material fact.

198.   Defendants did not have reasonable grounds for believing that their misrepresentations of the price of the homes LGI sold were true, and should have known that their misrepresentations were false.

199.   Defendants intended to induce Plaintiffs to rely on their misrepresentations about the prices of the homes LGI sold.

200.   Plaintiffs relied on Defendants' misrepresentations and their reliance was justifiable.

201.   Plaintiffs have been damaged by Defendants' false statements because they have lost money after relying on Defendants' false statements. The amount of damage is to be determined at trial but in the aggregate is in excess of $5,000,000.

## FOURTH CAUSE OF ACTION

## Violation of the Truth in Lending Act ("TILA") — Residential Mortgage Loan Origination
### (On Behalf of Plaintiffs and the Classes Against LGI)

202.   Plaintiffs reallege and incorporate by reference Paragraphs 1–176 as if fully set forth herein.

66

203.    LGI performed one or more of the enumerated mortgage originator activities with respect to the residential mortgage loans obtained by Plaintiffs and the Class Members. Specifically, LGI, through its sales personnel:

a.    collected and recorded prospective Homebuyers' loan application information, including income, assets, and other financial information, on a "pre-qualification form" or equivalent intake document, and caused Homebuyers' consumer credit reports to be pulled and reviewed;

b.    evaluated that information to determine, and then communicated to Homebuyers, whether and for what amount Homebuyers qualified for financing, including by advising Homebuyers on steps to raise their credit scores into qualifying range;

c.    referred and directed Homebuyers to loanDepot and LGI Mortgage as the source of financing; and

d.    presented or discussed particular financing terms, including the advertised monthly payment figures, selected on the basis of Homebuyers' financial characteristics.

204.    The activities described in preceding paragraph exceed the "purely administrative or clerical tasks" excluded from the definition of "loan originator" Included in the federal regulations implementing the Truth in Lending Act. *See* 12 C.F.R. § 1026.36(a)(1)(i)(A), Official Interpretation ¶ 36(a)-4.

205.    LGI performed the foregoing activities for direct or indirect compensation or gain, and in the expectation thereof. On information and belief, LGI received and/or expected to receive compensation or monetary gain connected to the placement of Plaintiffs' and Class Members' loans with

loanDepot and LGI Mortgage, including one or more of the following: (i) distributions or returns from loanDepot and LGI Mortgage; (ii) referral or marketing services payments; and (iii) fees imposed on Homebuyers in connection with the credit application or credit report process that LGI marked up and retained. *See* 12 C.F.R. § 1026.36(a)(3) (defining "compensation"), Official Interpretation ¶ 36(a)-5.v (retained fee mark-up is compensation).

206.   LGI performed the mortgage originator activities described above without being licensed or registered as a mortgage originator as required, in violation of 15 U.S.C. § 1639b(b)(1).

207.   Despite knowing that Homebuyers lacked a reasonable ability to repay loanDepot's and LGI Mortgage's residential mortgage loans, LGI steered Plaintiffs and Class Members to loanDepot and LGI Mortgage financing in violation of 15 U.S.C. § 1639b(c)(3) by, *inter alia*:

a.   presenting loanDepot or LGI Mortgage as Homebuyers' only financing option and declining to present or facilitate alternate financing;

b.   conditioning advertised incentives, including payment of closing costs, on Homebuyers' use of loanDepot and LGI Mortgage; and

c.   directing Homebuyers into loans that Homebuyers lacked a reasonable ability to repay, including by presenting advertised principal and interest figures that omitted taxes, insurance, and homeowners' association charges.

68

208. As a direct and proximate result of LGI's violations, Plaintiffs and the Class Members were injured, including by being placed into residential mortgage loans on terms less favorable than those for which they qualified or that were otherwise available to them, by incurring finance charges, fees, and above-market interest attributable to those loans, and by additional injury as pleaded elsewhere in the Complaint. The amount of damage is to be determined at trial but in the aggregate is in excess of $5,000,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Classes on all counts, and against Defendants for:

a. an order certifying this case to proceed as a class action, designating Plaintiffs as the representatives of the Classes, and designating the undersigned attorneys as Class Counsel;

b. actual damages and interest;

c. a declaration that Defendants' conduct is unlawful as set forth herein;

d. injunctive relief requiring Defendants to cease all such unlawful conduct;

e. equitable relief including but not limited to disgorgement of Defendants' profits;

f. restitution;

g. awarding Plaintiff pre-judgment and post-judgment interest to the extent permitted by law;

h. awarding Plaintiff its reasonable attorney's fees, costs, and expenses incurred in prosecuting this action, to the extent permitted by law;

i. and such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated: July 29, 2026

**MELAND BUDWICK, P.A.**

By: */s/Eric W. Ostroff*
Eric W. Ostroff
Florida Bar No. 10130
eostroff@melandbudwick.com
Will J. Rosenzweig
Florida Bar No. 1075685
wrosenzweig@melandbudwick.com
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Fax: (305) 358-1221

**SLARSKEY LLC**
Adam Hollander (*pro hac vice* forthcoming)
David Slarskey (*pro hac vice* forthcoming)
Deepa Devanathan (*pro hac vice* forthcoming)
825 Third Avenue, 32nd Floor
New York, NY 10022
(212) 658-0661

**HUNTERBROOK LAW**
Joseph Slaughter (*pro hac vice* forthcoming)
2942 N 24th St, Ste 115
PMB 143531
Phoenix, Arizona 85016

*Counsel for Plaintiffs*

70