**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

MARA CONNELLY and RICHARD BRYAN WILSON, on and behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

LGI HOMES, INC., LOANDEPOT, INC., and LGI MORTGAGE SOLUTIONS, LLC,

*Defendants*.
______________________________/

Case No.: 5:26-cv-00539-JSS-PRL

**DEFENDANTS LOANDEPOT, INC.'S AND LGI MORTGAGE SOLUTIONS, LLC'S JOINT OMNIBUS MOTION TO COMPEL ARBITRATION AND TO STAY THE CASE OR, IN THE ALTERNATIVE, MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................3

I. Plaintiffs allege LGI induced them to purchase their homes. ......................3

II. Plaintiffs obtain loans from loanDepot.com. ..............................................5

III. Plaintiffs agree to individual arbitration. ..................................................7

IV. Plaintiffs file a class action complaint in this Court. ..................................9

ARGUMENT ....................................................................................9

I. The Court Should Compel Arbitration of Plaintiffs' Claims Against Lender Defendants and Stay the Litigation. ..............................................9

A. Plaintiffs entered into valid arbitration agreements, which Lender Defendants may enforce. ..............................................10

1. Equitable Estoppel ..............................................11

2. Third Party Beneficiary..............................................14

B. The Court should delegate to the arbitrators Plaintiffs' argument that the arbitration agreement is unenforceable under TILA. .............15

C. The delegation provisions are not unconscionable. ............................17

D. TILA does not invalidate Plaintiffs' arbitration agreements. ..............21

E. The Court should enter a stay pending completion of arbitration. ..............................................22

II. In the Alternative, the Court Should Dismiss Lender Defendants. ...............23

A. The Court should dismiss loanDepot, Inc. for lack of personal jurisdiction. ..............................................23

1. Florida's Long-Arm Statute does not reach loanDepot, Inc. ..............................................24

2. The exercise of personal jurisdiction over loanDepot, Inc. would violate due process. ..............................................27

B. The Court should dismiss Counts I, II, and III as to Lender Defendants for failure to state a claim. ..............................................28

1. The Complaint is an impermissible shotgun pleading. ............29

2. Plaintiffs have failed to state a FDUTPA claim (Count I)

against Lender Defendants. ....................................................31

a. Plaintiffs allege no deceptive or unfair act by Lender Defendants. ....................................................31

b. Lender Defendants cannot be held liable for LGI's alleged conduct. ....................................................32

c. Plaintiffs do not allege causation. ....................................................33

3. Plaintiffs have failed to state a misrepresentation claim (Counts II and III) against Lender Defendants. ....................................................34

CONCLUSION ....................................................35

## INTRODUCTION

This action arises from Plaintiffs' purchase of homes from Defendant LGI Homes, Inc. ("LGI"). Plaintiffs allege that LGI ran a deceptive sales scheme to sell homes while supposedly concealing the true costs of those homes. Compl. ¶¶ 4–17. In conclusory fashion, Plaintiffs attempt to hold Defendants loanDepot, Inc. and LGI Mortgage Solutions, LLC ("LGI Mortgage") (together, "Lender Defendants") liable for LGI's alleged scheme, although Plaintiffs do not allege that either Lender Defendant made any deceptive statement or engaged in any unfair practice.

As a threshold matter, the Court should compel arbitration and stay the lawsuit because both Plaintiffs agreed to resolve the claims they assert against Lender Defendants through individual arbitration. Each Plaintiff signed a Purchase Agreement with LGI (the "Purchase Agreements"), which included arbitration agreements. By their terms, the arbitration agreements may be enforced by Lender Defendants, as "affiliates" of LGI. In addition, because Plaintiffs have relied upon the Purchase Agreements to support their claims and allege interdependent conduct between LGI and the Lender Defendants, Plaintiffs are estopped from disclaiming those agreements. The arbitration agreements include provisions delegating to the arbitrator gateway questions of arbitrability, so the Court should compel arbitration on that ground alone. In any event, Plaintiffs' contention that the arbitration agreements are barred by the Truth in Lending Act ("TILA") is wrong: TILA does

not preclude a mortgage lender or broker from enforcing an arbitration agreement in a separate contract between the home buyer and seller. The Court should compel arbitration of the claims asserted against the Lender Defendants and stay the litigation until completion of the arbitration.

In the alternative, Lender Defendants move to dismiss the Complaint in its entirety. At the outset, loanDepot, Inc. should be dismissed for lack of personal jurisdiction. As set forth in the accompanying Declarations of Greg Smith (**Exhibit A**) and Caren Tank (**Exhibit B**), loanDepot, Inc. is a non-operating Delaware holding company with its principal place of business in California. Although Plaintiffs allege loanDepot, Inc. was their lender, Plaintiffs' loans actually were from an indirect, legally distinct subsidiary of loanDepot, Inc., loanDepot.com, LLC ("loanDepot.com"). There is no basis under Florida's long-arm statute or due process to exercise personal jurisdiction over loanDepot, Inc.

The Complaint also fails to state a claim as to both Lender Defendants for several independent reasons. For one, the Complaint is a shotgun pleading. Plaintiffs incorporate all 176 paragraphs of factual allegations into each of their counts, without any effort to identify which allegations support which claims against which Defendant. Plaintiffs then plead each element of each claim against "Defendants" generally, even though their factual allegations attribute the conduct at issue to LGI alone. The Eleventh Circuit has condemned both practices.

Plaintiffs have also failed to state a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Every alleged deceptive or unfair act was purportedly committed by LGI, not Lender Defendants, and Plaintiffs have alleged no basis to hold Lender Defendants liable for LGI's alleged conduct.

Finally, Plaintiffs' misrepresentation claims fail under Federal Rule of Civil Procedure 9(b) because Plaintiffs identify no alleged false statement by either Lender Defendant. On the contrary, the Complaint alleges that LGI, not Lender Defendants, made the allegedly misleading statements about the cost of Plaintiffs' homes and that Lender Defendants accurately disclosed Plaintiffs' true home costs.

## BACKGROUND

### I. Plaintiffs allege LGI induced them to purchase their homes.

Plaintiffs purchased homes from LGI, financed by loans from loanDepot.com, brokered by LGI Mortgage. Compl. ¶¶ 131–157. Plaintiffs contend LGI induced them into buying homes without realizing the true costs of home ownership.

Plaintiff Mara Connelly ("Connelly") alleges LGI sent her postcards advertising the "low monthly cost of purchasing a home from LGI," including for as little as $900/month or $1,900/month. *Id.* ¶¶ 132–33. While she does not say which advertised costs she relied upon ($900/month versus $1,900/month) or set forth any of the details of these alleged advertisements (including when they were sent and what else they said), Connelly claims she was induced by the advertisements into

visiting an LGI sales office in June 2024. *Id.* ¶¶ 133–34.

Once there, an LGI salesperson quoted Connelly a home price, ran her credit, and told her that homes were "selling fast." *Id.* ¶¶ 135–37. Someone from "LGI" also supposedly told her that "monthly housing costs would not increase," but she does not allege when she was told this or by whom. *Id.* ¶ 144. Based on her supposed belief that her total monthly cost would not exceed LGI's allegedly advertised cost, Connelly entered into a Purchase Agreement (attached as **Exhibit C**) on July 14, 2024, which committed her to pay a non-refundable deposit of $1,000 and purchase a home for $349,900, contingent upon her ability to secure financing. Ex. C ¶¶ 2–4, at 1, 16.[1] Only then did Connelly tell the LGI salesperson that she wanted to keep her "total monthly payment below $2,000," in response to which the LGI salesperson made clear that there would be "extra, monthly fees" and suggested ways for Connelly to increase her income. Compl. ¶ 138.

Plaintiff Richard Bryan Wilson ("Wilson") alleges he "became aware of LGI through online advertising" about purchasing a home for no down payment but provides no details about when or where he saw those advertisements, or what else

---

[1] Because Plaintiffs' Purchase Agreements with LGI contain arbitration agreements that Lender Defendants seek to enforce in this motion, the Court may consider them. *See Riley v. Gen. Motors, LLC*, 664 F. Supp. 3d 1336, 1350 (M.D. Fla. 2023). The Purchase Agreements attached to this motion have been authenticated as true and correct copies in the declaration submitted with LGI's motion. The Court may also consider the Purchase Agreements because they are incorporated by reference in the Complaint. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

they said. *Id.* ¶ 147. He alleges he visited LGI's website, but does not describe what he saw. *Id.* ¶ 148. He says he then visited an LGI sales office, where he was told he could purchase a brand-new home for $300,000 and that his homeowners' association ("HOA") fees would remain approximately $50/month. *Id.* ¶¶ 148–51. Purportedly relying on the advertisement of no down payment and the quoted $300,000 purchase price, Wilson executed his Purchase Agreement on November 16, 2023 (**Exhibit D**), which committed him to pay the $1,000 deposit and purchase a home for $289,900, contingent upon his ability to secure financing. Ex. D ¶¶ 2–4, at 1, 16. Unlike Connelly, however, Wilson does not allege LGI made any misleading disclosures about the total monthly cost.

Plaintiffs do not allege that Lender Defendants made any of the alleged statements or otherwise played any role in inducing Plaintiffs to enter into their Purchase Agreements.

## II. <u>Plaintiffs obtain loans from loanDepot.com</u>.

Only *after* entering into their Purchase Agreements did Lender Defendants become involved. At that point, LGI referred each Plaintiff to LGI Mortgage and loanDepot.com. Compl. ¶¶ 139–40, 152–53. Although Plaintiffs contend their lender was loanDepot, Inc., that allegation is refuted by Lender Defendants' declarations and documents incorporated by reference in the Complaint. loanDepot, Inc. is a non-operating holding company (Smith Decl. ¶ 9); Plaintiffs' lender was loanDepot.com.

Tank Decl. ¶¶ 6–10, Exs. 1–4.

On August 29, 2024, loanDepot.com sent Connelly several documents, including her loan estimate (Tank Decl., Ex. 1)[2]. The loan estimate revealed that Connelly's total monthly payment, including property tax and other escrow costs, would be around *$2,300* and that her property taxes, homeowner's insurance, and other fees could "increase over time." Tank Decl., Ex. 1 at 1. Despite loanDepot.com's disclosures, Connelly still elected to proceed with buying her home at the higher monthly cost. In her September 16, 2024 closing disclosure (Tank Decl., Ex. 2), loanDepot.com disclosed that Connelly's monthly payment would be $2,418—exactly what Connelly paid her first year (Compl. ¶ 143)—and again disclosed that escrow costs could increase. Tank Decl., Ex. 2 at 1, 4.

For Wilson, loanDepot.com provided a loan estimate on November 20, 2023 (Tank Decl., Ex. 3). Like Conelly's, Wilson's loan estimate showed Wilson's total estimated monthly payment amount, including escrow costs, and explained that the monthly cost could increase over time. It also showed that Wilson would owe more than $2,000 at closing. Tank Decl., Ex. 3 at 1. Nevertheless, Wilson proceeded to closing, obtaining a VA mortgage loan from loanDepot.com. Wilson's closing disclosure (Tank Decl., Ex. 4) revealed a monthly payment of $2,126.84—exactly

[2] The court may consider Plaintiffs' loan estimates and closing disclosures because they are incorporated by reference in the Complaint. *See* Compl. ¶¶ 141, 153.

what Wilson ended up paying (Compl. ¶ 157)—and again made clear that his monthly cost could increase in the future. Tank Decl., Ex. 4 at 1, 4.

Neither Plaintiff alleges that any of the disclosures made to them by Lender Defendants were false, misleading, or inaccurate.

## III. **<u>Plaintiffs agree to individual arbitration</u>.**

Each Plaintiff's Purchase Agreement contains a clear and conspicuous arbitration clause. In relevant part, the arbitration clauses provide:

> [a]ny and all claims, disputes and controversies by or between [Plaintiffs] and [LGI], whether in contract, equity or tort, arising out of, or in any way related to the purchase of the Property, the construction related to the Property, or otherwise related to Buyer's dealings or relationships with [LGI] (a "Dispute") shall be resolved solely by the dispute resolution process identified in this Section.

Ex. C § 21 at 7; Ex. D § 21 at 7. The "dispute resolution process" identified in Section 21 is "binding arbitration" on an *individual* basis by a national arbitration provider. Ex. C § 21(C) at 8; Ex. D § 21(C) at 8. Section 21 contains no carve-out for Plaintiffs' claims and provides that "[a]ny and all issues relating to the arbitrability of the Dispute shall be decided by the arbitrator." Ex. C § 21 at 9; Ex. D § 21 at 8.[3]

Plaintiffs further agreed "that any dispute involving [LGI's] … affiliates … shall be resolved as set forth [in § 21] and *not* in a court of law or equity[.]" Ex. C §

---

[3] The arbitration clauses also explicitly "waiv[e] the right to trial by judge and/or jury" and "the right to institute or participate in a class action arbitration or litigation for any Dispute or other matter covered by this Agreement." Ex. C § 21 at 7, 9; Ex. D § 21 at 7, 8.

21 at 9; Ex. D § 21 at 9 (emphasis added in both). In turn, the Purchase Agreements identified Lender Defendants as LGI's "affiliates." Specifically, Section 27 provides that LGI has "a 50% ownership interest" in LGI Mortgage and directs Plaintiffs to the "Affiliated Business Arrangement Disclosure." Ex. C § 27(N) at 15; Ex. D § 27(L) at 14. The Affiliated Business Arrangement Disclosures, which each Plaintiff signed, identified both LGI Mortgage and "loanDepot." Ex. C at 19; Ex. D at 22.

The Purchase Agreements repeatedly and conspicuously disclosed the arbitration agreement and class action and jury trial waivers. In bold and fully capitalized text at the top of the first page of each agreement, Plaintiffs were told that the Purchase Agreements "**INCLUD[ED] A REQUIREMENT THAT ANY DISPUTES BE DECIDED BY ALTERNATIVE DISPUTE RESOLUTION.**" Ex. C at 1; Ex. D at 1 (emphasis in original in both). The arbitration agreements were also set in bold type noticeably larger than the surrounding text. Ex. C at 7–10; Ex. D at 7–10. And each Plaintiff agreed in capitalized text:

> BUYER REPRESENTS THAT BUYER HAS READ AND UNDERSTANDS THIS AGREEMENT, INCLUDING THE AGREEMENT FOR ALTERNATIVE DISPUTE RESOLUTION. BUYER AGREES THAT NO VERBAL STATEMENT, PROMISE, OR CONDITION NOT SPECIFICALLY LISTED IN THIS AGREEMENT IS BEING RELIED UPON BY BUYER.

Ex. C § 29, at 15; Ex. D § 29, at 14. The Purchase Agreements are fully integrated and supersede "all prior written or verbal negotiations, discussions and writings between the parties." Ex. C § 26(K), at 12; Ex. D § 26(K), at 12; *see also* Ex. C §

25, at 11; Ex. D § 25, at 10 ("Buyer specifically waives and disclaims reliance on any representations not contained herein, whether oral or written.").

## IV. Plaintiffs file a class action complaint in this Court.

Notwithstanding their agreements to arbitrate and waiver of their right to pursue a class action or jury trial, Plaintiffs filed their Complaint on July 29, 2026. Plaintiffs allege a "bait and switch" scheme in which LGI advertised homes at a lower total cost than Plaintiffs ultimately incurred. Plaintiffs assert three causes of action against all Defendants: Count I, for violation of FDUTPA; Count II, for fraud; and Count III, for negligent misrepresentation. Compl. ¶¶ 177–201. Plaintiffs also assert a fourth cause of action for violation of TILA against LGI alone. *Id*. ¶¶ 202–08. Plaintiffs purport to assert all their claims on behalf of a putative class of other Florida purchasers of LGI homes. *Id*. ¶¶ 158–76.

# ARGUMENT

## I. The Court Should Compel Arbitration of Plaintiffs' Claims Against Lender Defendants and Stay the Litigation.

"The [Federal Arbitration Act] establishes 'a liberal federal policy favoring arbitration [agreements] and the fundamental principle that arbitration is a matter of contract.'" *Martinez v. Symbotic, LLC*, 2026 WL 612934, at *2 (M.D. Fla. Mar. 4, 2026) (quoting *Jones v. Waffle House, Inc*., 866 F.3d 1257, 1264 (11th Cir. 2017)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S.

1, 24-25 (1983). When a motion to compel arbitration is filed, courts consider: "(1) 'whether a valid agreement to arbitrate exists'; (2) 'whether an arbitrable issue exists'; and (3) whether the right to arbitrate has been waived." *Jarrell v. Truist Bank*, 2026 WL 2083240, at *3 (M.D. Fla. July 20, 2026).

Each of those requirements is satisfied. Plaintiffs signed Purchase Agreements containing valid arbitration agreements that the Lender Defendants may enforce as affiliates of LGI and under Florida's equitable-estoppel and third-party beneficiary doctrines. Those agreements are broad and delegate threshold questions of arbitrability—including whether TILA precludes arbitration—to the arbitrator, which resolves this motion without more. But should the Court reach the TILA issue, Plaintiffs' position still fails on its merits. No party contends the right to arbitrate has been waived; Lender Defendants raise it in their first responsive filing.

**A. Plaintiffs entered into valid arbitration agreements, which Lender Defendants may enforce.**

"The FAA governs the validity of an arbitration agreement; however, state law governs whether an enforceable contract or agreement to arbitrate exists." *Goodall v. Am. Express Co.*, 2019 WL 4306404, at *2 (M.D. Fla. Aug. 26, 2019) (citing *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005)). Likewise, the question of whether Lender Defendants, as non-parties to the arbitration agreements, "can enforce [those] agreement[s] is governed by state law." *Riley v. Gen. Motors, LLC*, 664 F. Supp. 3d 1336, 1350 (M.D. Fla. 2023). "The federal policy favoring

arbitration, however, is taken into consideration even in applying ordinary state law." *Caley*, 428 F.3d at 1368 (internal quotation and citation omitted).

There is no dispute that Plaintiffs entered into valid agreements to arbitrate with LGI. Compl. ¶¶ 126–28. Each Plaintiff signed his or her respective Purchase Agreement and initialed every page. *See generally* Exs. C & D. Florida recognizes two situations in which nonsignatories, like Lender Defendants, may enforce an arbitration agreement against a signatory: (1) where the signatory is equitably estopped from disclaiming the arbitration agreement; and (2) where the nonsignatory is an intended third-party beneficiary of the arbitration agreement. *See Riley*, 664 F. Supp. 3d at 1350-51. Both situations exist here.

*1. Equitable Estoppel*

Under the doctrine of equitable estoppel, a nonsignatory may compel arbitration when either: (1) "the signatory ... must rely on the terms of the written agreement in asserting its claims against the nonsignatory; or (2) when there are allegations of concerted action by both a nonsignatory and one or more of the signatories to the contract." *Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So. 3d 644, 646 (Fla. 3d DCA. 2014) (cleaned up). Here, both circumstances permitting estoppel are present.

The purpose of the first form of equitable estoppel is "to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the

contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage." *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1320 (11th Cir. 2013). "The plaintiff's actual depend[e]nce on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id*. "When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." *Liles v. Ginn-La W. End, Ltd*., 631 F.3d 1242, 1256 (11th Cir. 2011) (cleaned up); *see also Giller v. Cafeteria of S. Beach Ltd., LLP*, 967 So. 2d 240, 242 (Fla. 3d DCA 2007) ("One cannot both take advantage of contract provisions to seek to impose liability on an individual professional and at the same time avoid another contract term or provision for which it has no use.").

Plaintiffs' claims depend upon their Purchase Agreements. Plaintiffs allege LGI fraudulently induced them into entering into the Purchase Agreements, and paying the required $1,000 deposit, through false or misleading advertising about the true costs of Plaintiffs' homes and "high pressure" sales tactics. Compl. ¶¶ 122, 136–39, 148–52, 191, 197. While Plaintiffs concede Lender Defendants disclosed the true costs of Plaintiffs' homes before closing, Plaintiffs blame the $1,000 deposit for supposedly forcing them to proceed anyway in purchasing homes that were more

expensive, on a monthly basis, than Plaintiffs claim they expected. *Id.* ¶¶ 141–43, 153–57. Thus, Plaintiffs' claims are dependent upon the Purchase Agreements, which created the deposit obligation and fixed the purchase price that resulted in the alleged higher than anticipated costs. Signatories, like Plaintiffs, cannot rely on a contract to support their claims while simultaneously disclaiming the contract's arbitration provisions. *See Bailey*, 705 F.3d at 1320–21; *Liles*, 631 F.3d at 1256-57. But that is precisely what Plaintiffs attempt: they rely on the Purchase Agreements while repudiating their agreements to arbitrate.

Plaintiffs are also independently estopped because they allege concerted conduct between LGI and the Lender Defendants. *See* Compl. ¶ 6. Albeit in conclusory fashion, Plaintiffs allege that LGI, loanDepot, Inc., and LGI Mortgage "have worked in concert" for years to sell and finance homes (*id.*) and that "Defendants," collectively, concealed the true cost of homeownership "at each stage of the sales-and-financing process" (*id.* ¶ 185). Plaintiffs cannot purport to plead a single, unified scheme carried out jointly by LGI and Lender Defendants in an attempt to establish liability but simultaneously separate those same Defendants to escape the dispute resolution procedures Plaintiffs' Purchase Agreements require. *Chemaly v. Lampert,* 174 F.4th 843, 857 (11th Cir. 2026) (concerted misconduct estoppel applies where the plaintiff alleges the signatory and nonsignatory engaged in "interdependent and concerted misconduct" and "that misconduct gave rise to

claims falling within the scope of the contract").

*2. Third Party Beneficiary*

Lender Defendants can separately enforce Plaintiffs' arbitration agreements as intended third-party beneficiaries of those agreements. "[T]he intended third-party beneficiary doctrine … allows a nonsignatory to compel arbitration when the parties to a contract agree upon formation to confer certain benefits upon a third party, affording that third party rights of action against them under the contract." *Rodriguez v. NCL (Bahamas) Ltd.*, 2025 WL 472427, at *6 (S.D. Fla. Feb. 12, 2025) (internal quotations and citation omitted). To qualify as a third-party beneficiary, there must be "'clear intent' that 'the direct and primary object of the contracting parties was to confer a benefit on the third party.'" *Id.*

Here, the Purchase Agreements conditioned Plaintiffs' performance on obtaining financing, and attached the Affiliated Business Arrangement Disclosures, identifying Lender Defendants as financing affiliates. *See* Ex. C § 4; Ex. D § 4. The Affiliated Business Arrangement Disclosures expressly disclosed that LGI and its affiliates (i.e., Lender Defendants) stood to receive "a financial or other benefit" from these referrals. Ex. C at 19; Ex. D at 22. In addition, Section 21 extends the dispute-resolution provision to disputes "involving Seller's … affiliates," which include Lender Defendants. Ex. C §§ 21, 27(N); Ex. D §§ 21, 27(L). A contract that names a class of beneficiaries and then confers on that class the right to resolve

disputes in a specified forum expresses exactly the "clear intent" the doctrine requires. *See Rodriguez*, 2025 WL 472427, at *6.

### B. The Court should delegate to the arbitrators Plaintiffs' argument that the arbitration agreement is unenforceable under TILA.

Having established that Lender Defendants may enforce Plaintiffs' arbitration agreements, the next step for the Court is to determine whether the agreements are "unenforceable for reasons of fraud or unconscionability, waiver, failure to comply with conditions precedent to arbitration under the agreement[s], or statutory barriers to arbitration." *Rogers v. Glob. Lending Servs. LLC*, 2025 WL 2743682, at *7 (N.D. Ga. July 29, 2025), *report and recommendation adopted*, 2025 WL 2743747 (N.D. Ga. Aug. 18, 2025). According to Plaintiffs, there is a "statutory barrier[]" to arbitration: TILA, 15 U.S.C. §§ 1639c(e)(1) & 1639c(e)(3), which generally precludes residential mortgage loan agreements from containing arbitration provisions. Compl. ¶ 127.

Plaintiffs' TILA argument, however, should be resolved by the arbitrator, not the Court. Threshold questions of arbitrability, including the existence of statutory barriers to arbitration, can be delegated by the arbitration agreement to the arbitrator to resolve in the first instance. *See Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010); *McIntosh v. Hilton Grand Vacations, Inc.*, 2025 WL 5241428 (M.D. Fla. June 25, 2025), *report and recommendation adopted*, 2025 WL 5241430 (M.D. Fla. Aug. 5, 2025). That is the case here.

As the Supreme Court has explained, the parties may agree to arbitrate threshold issues, including "whether their agreement covers a particular controversy." *Rent-A-Ctr. W., Inc.*, 561 U.S. at 69. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. A court may not override an agreed-to delegation provision "even if the court thinks that a party's claim on the merits is frivolous." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 70 (2019). When parties have expressed with "clear and unmistakable evidence" their intent to delegate "threshold arbitrability questions," a court may not decide those issues. *Id.* at 69 (internal quotation omitted).

The Purchase Agreements unmistakably delegate to the arbitrator "[a]ny and all issues relating to the arbitrability of the Dispute." Ex. C § 21 at 9; Ex. D § 21 at 8. This language constitutes a "clear and unmistakable delegation" of threshold questions of arbitrability to the arbitrator, not the Court. *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1295–99 (11th Cir. 2022); *Jones*, 866 F.3d at 1267. Nonsignatories entitled to enforce an arbitration agreement, like the Lender Defendants, are equally entitled to enforce the delegation provision within it. *See Various Insurers v. Gen. Elec. Int'l*, 131 F.4th 1273, 1279–80 (11th Cir. 2025) (recognizing that a delegation provision meant the arbitrator should decide which, if

any, of the plaintiffs' claims were arbitrable, including as to nonsignatory defendants).

The Eleventh Circuit's decision in *Attix* is exactly on point. There, the plaintiff attempted to avoid a mortgage servicer's motion to compel arbitration by arguing, like Plaintiffs here, that TILA precluded arbitration of claims related to a mortgage loan. *Attix*, 35 F.4th at 1295–99.[4] Despite the arbitration agreement's delegation clause, the district court concluded that it, not the arbitrator, should resolve the TILA issue. *Id*. at 1295. The Eleventh Circuit disagreed. In reversing and compelling arbitration, the court explained that when there is "a delegation agreement and a question of arbitrability," courts must "stop." *Id*. at 1310. "Because Attix's [TILA] challenge is only about the enforceability of the parties' primary arbitration agreement, under the parties' delegation agreement, an arbitrator must resolve it." *Id*. at 1309. The same analysis governs here. Plaintiffs contend the same TILA provisions invalidate their arbitration agreements. Because Plaintiffs agreed to delegate to the arbitrator all questions of arbitrability, the arbitrator must decide this issue in the first instance, not the Court.

### C. The delegation provisions are not unconscionable.

Plaintiffs' only counter to the result dictated by *Attix* is to argue that the

[4] *Attix* refers to the same statutory provision upon which Plaintiffs here rely—15 U.S.C. § 1639c(e)(3)—but says that provision is part of "Dodd-Frank." This is correct. The Dodd-Frank Act amended TILA to insert the foregoing provision.

delegation provisions are unconscionable. Plaintiffs are wrong. Under Florida law a party must establish both procedural and substantive unconscionability, *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1157–59 (Fla. 2014), and the showing must be directed at the delegation provision itself. *See Foote v. All Elite Wrestling, LLC*, 2025 WL 1913228, at *2–3 (M.D. Fla. June 11, 2025) (rejecting a delegation challenge where the plaintiff argued the provision was unconscionable for the same reasons as the contract more generally). Plaintiffs establish neither.

Plaintiffs say the delegation provisions are procedurally unconscionable because they were "buried in adhesive form contracts presented to unsophisticated first-time homebuyers who were rushed to sign." Compl. ¶ 129. The latter two complaints—haste and sophistication—are directed at the contracting process as a whole, not at the delegation provision, and the Court should disregard them. *See Rent-A-Center*, 561 U.S. at 72; *Foote*, 2025 WL 1913228, at *2–3. In any event, presenting a delegation provision in an adhesive, take-it-or-leave-it contract does not make the provision procedurally unconscionable. *See In re Checking Account Overdraft Litig.*, 856 F. App'x 238, 246–47 (11th Cir. 2021) (rejecting a "take-it-or-leave-it," no-opt-out theory of procedural unconscionability); *see also VoiceStream Wireless Corp. v. U.S. Commc'ns, Inc.*, 912 So. 2d 34, 40 (Fla. Dist. Ct. App. 2005).

The remaining objection—that the provisions were "buried"—is meritless. On the very first page of each agreement, in bolded, capitalized letters, Plaintiffs were

told that *any* disputes would be decided in ADR, which necessarily means disputes about arbitrability. *See* Ex. C at 1; Ex. D at 1. Section 21 then opens by applying the dispute-resolution process to "[a]ny and all claims, disputes and controversies by or between Buyer and Seller," Ex. C § 21 & Ex. D § 21, which, again, implicates arbitrability issues. The delegation provisions themselves, which provide "[a]ny and all issues relating to the arbitrability of the Dispute shall be decided by the arbitrator," Ex. C § 21 at 9, Ex. D § 21 at 8—are "written in clear, comprehensible terms and in readable type." *See Jones*, 866 F.3d at 1265–66. And Plaintiffs confirmed they read and understood the arbitration agreements. Ex. C § 29; Ex. D § 29. Courts routinely enforce delegation provisions that are not even contained within the arbitration agreement, but instead are incorporated by reference to national arbitration association rules. *E.g.*, *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005); *Attix*, 35 F.4th at 1296–97. By comparison, the Purchase Agreements' delegation clauses are far more conspicuous. The delegation provisions are not procedurally unconscionable.

Plaintiffs' substantive objections fare no better, and most of them are not specific to the delegation provision. Plaintiffs complain that a homebuyer contesting arbitrability must (a) pay upfront costs immediately and split arbitration costs; (b) submit to a provider that LGI selects; and (c) forgo statutory fee-shifting. Compl. ¶ 129. Each is a feature of Section 21 generally rather than of the delegation provision,

so each criticism is for the arbitrator. *See Rent-A-Center*, 561 U.S. at 71–72.

Even considered on their merits, the objections fail. Substantive unconscionability asks whether the terms are "so outrageously unfair as to shock the judicial conscience." *VoiceStream Wireless*, 912 So. 2d at 40. For cost-based objections, the party resisting arbitration "bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000); *accord Payne v. Savannah College of Art and Design, Inc.*, 81 F.4th 1187, 1196 (11th Cir. 2023) (fee-shifting provisions do not render arbitration agreement unenforceable absent specific evidence of the actual cost). But Plaintiffs plead no fee schedule, no dollar figure, and no facts about their own ability to pay. Equal sharing of administrative fees is a commonplace term; a contractual limitation on fee-shifting does not render an agreement unconscionable. *See Payne*, 81 F.4th at 1196. And permitting one party to select among established national providers is not oppression—particularly where the named providers include JAMS and AAA, both of whose consumer arbitration rules independently cap a consumer's share of the fees. *See* JAMS, *Consumer Arbitration Minimum Standards*, https://www.jamsadr.com/consumer-minimum-standards (last visited Sept. 21, 2026); AAA, *How Does the American Arbitration Association make the process affordable?* https://www.adr.org/news-and-insights/your-questions-about-

arbitration-answered/ (last visited Sept. 21, 2026).[5]

**D. TILA does not invalidate Plaintiffs' arbitration agreements.**

Regardless, TILA does not preclude Lender Defendants from arbitrating Plaintiffs' claims. "[N]either the text nor the legislative history of the TILA establishes that the plaintiffs have a non-waivable right to pursue a class action, or even to pursue an individual lawsuit, as distinguished from pursuing arbitration in order to obtain remedies for violations of the statute." *Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1338 (11th Cir. 2000). TILA does not invalidate Plaintiffs' agreement to arbitrate their claims against Lender Defendants.

Plaintiffs cite 15 U.S.C. § 1639c(e)(1), but that statute applies only to "residential mortgage loan[s]" and "extension[s] of credit under an open end consumer credit plan secured by the principal dwelling of the consumer[.]" The Purchase Agreements are neither.

Plaintiffs also cite 15 U.S.C. § 1639c(e)(3), but that statute is limited to "agreement[s] *between the consumer and the creditor* relating to the residential mortgage loan or extension of credit referred to in paragraph (1)." The Purchase Agreements are not "agreement[s] between the consumer and the creditor"—LGI is

[5] In any event, Lender Defendants remove any question of cost from this case. Without conceding that Section 21 requires it, Lender Defendants agree to pay the administrative fees of the arbitration provider and the arbitrator's fees and waive any reliance on Section 21's limitation on the award of statutory attorney's fees as to Plaintiffs' FDUTPA claim.

the seller of Plaintiffs' homes and is not a "creditor" under TILA. Plus, Section 1639c(e)(3) only applies to claims for violations of TILA "or any other Federal law," but the claims Lender Defendants seek to compel to arbitration are state law claims.

**E. The Court should enter a stay pending completion of arbitration.**

Once a court determines that "the issue involved in [a] suit or proceeding is referable to arbitration under" an agreement between the parties, it "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). The Supreme Court has explained that in Section 3 of the FAA, "the use of the word 'shall' creates an obligation impervious to judicial discretion." *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024). Because Plaintiffs' claims are subject to arbitration, the Court must enter a stay of the case pending completion of arbitration.[6]

[6] Should the Court determine that some but not all of Plaintiffs' claims should be compelled to arbitration (including Plaintiffs claims against LGI), the Court should exercise its discretion to stay Plaintiffs' remaining claims pending completion of arbitration. "When confronted with litigants advancing both arbitrable and nonarbitrable claims, … courts have discretion to stay nonarbitrable claims." *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004). A stay is warranted where the nonarbitrable claims are "*based on the exact same factual allegations*" as the claims proceeding in arbitration. *Variable Annuity Life Ins. Co. v. Laferrera*, 680 F. App'x 880, 884 (11th Cir. 2017) (emphasis added). Requiring a defendant to litigate the same facts and claims proceeding against another party in arbitration creates "the possibility of inconsistent results[,]" and should be avoided where possible. *Id.* at 885; *see also Supercooler Techs., Inc. v. Coca-Cola Co.*, 2025 WL 3271238, at *5 (M.D. Fla. Apr. 11, 2025). Applying these principles, Courts regularly stay nonarbitrable claims where they arise from the same underlying course of conduct as claims sent to arbitration. *See id.* (staying nonarbitrable claims, over plaintiff's objection, because "the outcome of the arbitrable claims may affect rulings and findings of the non-arbitrable claims"). That is the case here. All of Plaintiffs' claims arise from the same underlying alleged course of conduct. *See* Compl. ¶¶ 177–208.

## II. <u>In the Alternative, the Court Should Dismiss Lender Defendants.</u>

While the Court should compel arbitration and does not need to address the sufficiency of Plaintiffs' Complaint, if it chooses to reach those issues, the Court should dismiss Lender Defendants. The Court has no personal jurisdiction over loanDepot, Inc., and the Complaint fails to state a claim against Lender Defendants.

### A. The Court should dismiss loanDepot, Inc. for lack of personal jurisdiction.

Dismissal of Plaintiffs' claims against loanDepot, Inc. is warranted under Federal Rule of Civil Procedure 12(b)(2). "A plaintiff attempting to exert personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Dawson v. Generac Power Sys., Inc.*, 820 F. Supp. 3d 1306, 1317 (M.D. Fla. 2025) (internal quotation marks omitted). If a defendant submits evidence disputing the allegations, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

There is no basis for the Court to exercise personal jurisdiction over loanDepot, Inc. loanDepot, Inc. is a non-operating holding company. It holds no material assets besides its equity interests in LD Holdings Group LLC. Although the Complaint ascribes certain conduct to loanDepot, Inc., any alleged conduct

connected to Plaintiffs' loans would have been done by an indirect and independent loanDepot, Inc. subsidiary, loanDepot.com. There is no basis to exercise personal jurisdiction over loanDepot, Inc. under Florida's long-arm statute. Nor would the exercise of jurisdiction over loanDepot, Inc. comport with due process.

*1. Florida's Long-Arm Statute does not reach loanDepot, Inc.*

To determine whether it has personal jurisdiction over a defendant, a federal court must undertake a two-step process: first, the court must determine whether personal jurisdiction comports with the forum state's long-arm statute; if it does, the court then must determine whether the exercise of personal jurisdiction would run afoul of the Constitution's Due Process Clause. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Florida's long-arm statute is not coextensive with the limits of Due Process. Accordingly, the Court first must determine whether personal jurisdiction comports with Florida's long-arm statute.

Florida's long-arm statute recognizes two species of personal jurisdiction: (1) general jurisdiction, which can be exercised over defendants engaged in "substantial and not isolated activity" in the state, Section 48.193(2), Fla. Stat., and (2) specific jurisdiction, which can be exercised over a defendant with certain, statutorily-enumerated contacts with the state of Florida, as long as the claim arises from those contacts, Section 48.193(1)(a). Neither species of personal jurisdiction exists here.

There is no basis to exercise "general" jurisdiction over loanDepot, Inc. under

Florida's long-arm statute because loanDepot, Inc. does not conduct substantial activity in the state of Florida. Smith Decl. ¶¶ 14–23. Contrary to Plaintiffs' conclusory allegations (Compl. ¶ 25), loanDepot, Inc. is a non-operating Delaware holding company with its principal place of business in California and whose only material assets are equity interests in a separate non-operating holding company. Smith Decl. ¶¶ 7–10. To be sure, loanDepot, Inc. maintains a registered agent for service of process. Smith Decl. ¶ 23. But that, by itself, is insufficient to confer personal jurisdiction under Florida law. *See Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1319–20 (11th Cir. 2018); *Woodruff-Sawyer & Co. v. Ghilotti*, 255 So. 3d 423, 429 (Fla. Dist. Ct. App. 2018). Courts are clear that the Florida long-arm statute does not apply to foreign, non-operating holding companies without substantial activity in the state. *E.g.*, *Air Turbine Tech., Inc. v. Atlas Copco AB*, 235 F. Supp. 2d 1287, 1289–91 (S.D. Fla. 2002).

There also is no basis to exercise "specific" jurisdiction over loanDepot, Inc. under Florida's long-arm statute. As a non-operating holding company uninvolved in the transactions at issue, loanDepot, Inc. has no contacts with the state from which Plaintiffs' claims arise. *See* Smith Decl. ¶¶ 14–23; Tank Decl. ¶¶ 10–13; *Ghilotti*, 255 So. 3d at 430 (recognizing that there must be "a causal connection between the defendant's activities in Florida and the plaintiff's cause of action.").

Nor does the fact that Plaintiffs' loans were originated by loanDepot, Inc.'s

indirect subsidiary, loanDepot.com, provide a basis to exercise personal jurisdiction over loanDepot, Inc. "[A] parent corporation and its wholly-owned subsidiary are separate and distinct legal entities," and a foreign parent is not subject to jurisdiction in Florida merely because a subsidiary does business here. *Reynolds Am., Inc. v. Gero*, 56 So. 3d 117, 120–21 (Fla. 3d DCA 2011). A subsidiary's contacts are imputed to a parent only where the subsidiary is an alter ego, *see Daimler*, 571 U.S. at 134–36, or where "a parent corporation exerts such extensive operational control over a subsidiary that the subsidiary is no more than an agent existing to serve only the parent's needs[.]" *Gadea v. Star Cruises, Ltd.*, 949 So. 2d 1143, 1146 (Fla. 3d DCA 2007). It requires "not *some* control but '*operational* control' by the parent over the subsidiary," *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1343–44 (S.D. Fla. 2002), *aff'd*, 54 F. App'x 492 (11th Cir. 2002) (emphasis added)— that is, "the day-to-day control of the internal affairs or basic operations of the subsidiary." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015).

The Complaint pleads no facts even remotely approaching the exacting "operational control" standard, and the Smith and Tank Declarations affirmatively refute such control. Smith Decl. ¶ 13; Tank Decl. ¶¶ 14–18, 20. loanDepot, Inc. does not control loanDepot.com's day-to-day operations, direct its lending decisions, or treat it as anything other than a separate entity. Smith Decl. ¶ 13; Tank Decl. ¶¶ 14–

18. loanDepot.com's forum contacts cannot be imputed to loanDepot, Inc.

*2. The exercise of personal jurisdiction over loanDepot, Inc. would violate due process.*

Due process independently bars jurisdiction. "Even though a statute may permit a state to assert jurisdiction over a nonresident defendant, the due process clause ... protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). The Supreme Court recognizes two forms of personal jurisdiction: general jurisdiction, under which a defendant may be haled into court based on its continuous affiliations with the forum, and specific jurisdiction, which exists only when the plaintiff's claims arise out of or relate to the defendant's contacts with the forum. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). There is no basis for either.

***No general jurisdiction.*** General jurisdiction requires that the defendant be "at home" in the forum. *Daimler*, 571 U.S. at 137. For a corporation, the "paradigm" fora are the state of incorporation and its principal place of business. *Id*. The Complaint forecloses general jurisdiction: Plaintiffs allege loanDepot, Inc. is a Delaware corporation with its principal place of business in California. Compl. ¶ 22. loanDepot, Inc. is not at home in Florida.

***No specific jurisdiction.*** Specific jurisdiction requires that the plaintiff's

claims arise out of or relate to the defendant's contacts with Florida and that the defendant purposefully availed itself of the privilege of conducting activities in Florida. The defendant must have "fair warning" of suit in the forum, which is satisfied only where it "purposefully directed" its activities at the forum and the claims arise from those activities. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 811 (11th Cir. 2010). The contacts must be the defendant's own. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Plaintiffs allege "loanDepot" engaged in conduct in Florida from which their claims arise. The unrebutted facts show otherwise: loanDepot, Inc. is a non-operating holding company that was uninvolved in the transactions at issue. Tank Decl. ¶¶ 10–13. It directed no activities at Florida from which Plaintiffs' claims arise. So, loanDepot, Inc. should be dismissed for lack of personal jurisdiction.

**B. The Court should dismiss Counts I, II, and III as to Lender Defendants for failure to state a claim.**

The Court should also dismiss the claims against Lender Defendants under Rule 12(b)(6) for failure to state a claim. To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Id.* at 678. "While legal conclusions can provide the framework of a complaint, they must

be supported by factual allegations." *Id.* at 679. Where, as here, a plaintiff alleges fraud, negligent misrepresentation, or deceptive conduct under FDUTPA, the complaint must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Sunoptic Techs., LLC v. Integra Luxtec, Inc.*, 2009 WL 722320, at *2, *4 (M.D. Fla. Mar. 18, 2009).

*1. The Complaint is an impermissible shotgun pleading.*

The Complaint is a shotgun pleading that violates "the minimum standard of Rule 8." *Joseph v. Bernstein*, 612 F. App'x 551, 555 (11th Cir. 2015). The Court should heed the Eleventh Circuit's repeated directions to dismiss the complaint or, at minimum, order Plaintiffs to provide a more definite statement. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 n.10 (11th Cir. 2015).

A shotgun pleading is any complaint which "fail[s] to one degree or another ... to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. The Eleventh Circuit has recognized multiple types of shotgun pleadings, *see id.* at 1321–23, and Plaintiffs' Complaint fits at least two of those types.

First, a complaint is an impermissible shotgun pleading where every count incorporates by reference all prior factual allegations, "without any effort to connect or separate which of those [] factual allegations relate to a particular count."

*Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021). Plaintiffs have done that here. Every count begins: "Plaintiffs reallege and incorporate by reference Paragraphs 1-176 as if fully set forth herein." Compl. ¶¶ 177, 190, 196, 202. Plaintiffs make no effort to identify which of those 176 paragraphs supports which element of which claim against which Defendant. The incorporated paragraphs span LGI's marketing history (Compl. ¶¶ 27–53), LGI's sales practices (*id.* ¶¶ 54–110), the parties' joint venture and disclosure process (*id.* ¶¶ 111–130), Plaintiffs' individual transactions (*id.* ¶¶ 131–157), and class allegations (*id.* ¶¶ 158–176). Lender Defendants are left to guess which allegations Plaintiffs contend support, for example, the "deceptive act" element of Count I as against LGI Mortgage, or the "false statement" element of Count II as against loanDepot, Inc. The Eleventh Circuit has rejected similar pleading tactics. *Barmapov*, 986 F.3d at 1325–26.

Plaintiffs' Complaint is also a shotgun pleading because it "indiscriminately lumps together multiple defendants" and fails to explain how each is responsible. *Clifford v. Federman*, 855 F. App'x 525, 528 (11th Cir. 2021); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (affirming dismissal where complaint was "replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged"). The Complaint's factual allegations attribute the challenged conduct to LGI specifically (*see, e.g.*, Compl. ¶¶ 53, 132, 135–39, 147–52), yet in their Counts, Plaintiffs "indiscriminately

lump" all Defendants together for every element of their claims (*see, e.g.*, *id.* ¶¶ 183–89, 191–95, 197–201). Where a complaint's specific allegations attribute conduct to one defendant, a later collective assertion that "Defendants did it" does not pass muster. *E.g.*, *Council v. Ivey*, 771 F. Supp. 3d 1208, 1228–30 (M.D. Ala. 2025).

*2. Plaintiffs have failed to state a FDUTPA claim (Count I) against Lender Defendants.*

A FDUTPA damages claim requires both (1) a deceptive act or unfair practice and (2) causation. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). Plaintiffs plead neither element as to Lender Defendants.

a. Plaintiffs allege no deceptive or unfair act by Lender Defendants.

In Count I, Plaintiffs contend LGI perpetrated a bait-and-switch scheme, concealing the true cost of home ownership through misleading advertisements and price quotes that did not disclose escrow costs, while using "high-pressure sales tactics" to rush Plaintiffs into making decisions. *E.g.*, Compl. ¶¶ 132–38, 144–45, 147–52, 155, 183–84. Lender Defendants dispute that LGI's alleged conduct was deceptive or unfair. Not disclosing property tax or homeowner's insurance costs in a short advertisement is not misleading, because those costs would be obvious to any reasonable consumer. *See Millennium Commcn's & Fulfillment, Inc. v. Off. of Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (deceptive conduct must be "likely to mislead the consumer acting reasonably in the circumstances"). And the alleged

"high-pressure" sales tactics, which comprised telling Connelly homes were "selling fast" and insisting that Wilson close on the closing date, were not the sort of "immoral, unethical, oppressive, unscrupulous, or substantially injurious" actions that "offend[] established public policy." *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

Regardless, the Complaint attributes every alleged misleading statement and "high-pressure" tactic to LGI, not Lender Defendants. Compl. ¶¶ 132–38, 144–45, 147–52, 155, 183–84. The Complaint does not allege that Lender Defendants made any deceptive statement to either Plaintiff. On the contrary, Plaintiffs concede Lender Defendants made *truthful* disclosures to Plaintiffs. *E.g.*, Compl. ¶¶ 121(d), 122. loanDepot.com's loan estimates and closing disclosures accurately disclosed the estimated total monthly payments, separately identified the escrow amounts of property tax, insurance, and HOA fees, and made clear that escrowed costs would increase over time. Tank Decl., Exs. 1–4. A defendant that discloses the truth has done nothing deceptive. *Barrish v. Interiors by Steven G., Inc.*, 435 So. 3d 1134, 1139 (Fla. 3d DCA 2026)

b. Lender Defendants cannot be held liable for LGI's alleged conduct.

Because Lender Defendants committed no deceptive or unfair act of their own, Count I can survive only on a theory that Lender Defendants answer for LGI's conduct. FDUTPA permits such a theory only in the narrow circumstances where a

defendant directly participated in the deceptive practice or had the authority to control it. *See KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073–74 (Fla. 5th DCA 2008). Plaintiffs plead neither.

There is no allegation that either Lender Defendant wrote, reviewed, approved, or had any right to approve LGI's mailers, website, or sales scripts; nor that Lender Defendants had authority over LGI's salespeople, sales offices, purchase agreements, or deposit terms. The Complaint alleges the opposite: that LGI "control[led]" the "transaction," the "customer experience," the "flow of information to potential homebuyers," and referrals to Lender Defendants. *E.g.*, Compl. ¶¶ 45, 115, 185.

While Plaintiffs allege "loanDepot" is "part and parcel" of LGI's scheme (*id.* ¶ 117), that "Defendants" "act in concert" (*id.* ¶ 113), and that they all "work[] together through LGI Mortgage" (*id.* ¶ 121), those are conclusions, not facts. *See Iqbal*, 556 U.S. at 678. A public joint venture and a referral relationship do not establish that one venturer controlled the other's independent advertising and sales operations. FDUTPA does not "extend indirect liability to third parties for the unfair and deceptive acts of another, regardless of their relationship." *Wesley Fin. Group, LLC v. Westgate Resorts, Ltd.*, 746 F. Supp. 3d 1342, 1356–57 (M.D. Fla. 2024).

c. Plaintiffs do not allege causation.

Causation is an independent element of a FDUTPA claim, *see Rollins*, *Inc. v.*

*Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Plaintiffs' allegations foreclose causation as to Lender Defendants for two reasons.

First, the alleged inducement was complete before Lender Defendants ever spoke or transacted with Plaintiffs. Plaintiffs allege they were drawn in by LGI's advertising (Compl. ¶¶ 133, 147), committed at LGI's sales offices (*id.* ¶¶ 137, 152), signed LGI's Purchase agreements, and paid LGI's non-refundable deposit before any contact with Lender Defendants (*id.* ¶¶ 139, 152). Conduct occurring after a plaintiff has already taken the alleged "bait" could not have caused any injury. Second, Lender Defendants disclosed the very information Plaintiffs say was withheld, yet Plaintiffs proceeded with their home purchases anyway. *See supra* at 33–34. Plaintiffs' response—that withdrawal was "economically, psychologically, and practically arduous" by that point (Compl. ¶ 124)—concerns LGI's deposit requirement and contract terms, not any conduct of the Lender Defendants.

3. *Plaintiffs have failed to state a misrepresentation claim (Counts II and III) against Lender Defendants.*

Plaintiffs' fraudulent and negligent misrepresentation claims do not differ in any way requiring separate analysis. *See Hogarty v. Orgill, Inc.*, 2026 WL 1613955, at *9–10 (M.D. Fla. June 5, 2026). Both claims require false or misleading statements of material fact and justifiable reliance. *See Sunoptic Techs., LLC v. Integra Luxtec, Inc.*, 2009 WL 722320, at *2–3 (M.D. Fla. Mar. 18, 2009). Plaintiffs have not pleaded either element with the requisite specificity.

As explained above, the Complaint does not allege that either Lender Defendant made any misrepresentation to either Plaintiff, only truthful disclosures. *See supra* at 3–7, 31–32. Nor have Plaintiffs alleged facts sufficient to hold Lender Defendants liable for LGI's alleged statements. *See supra* at 32–33.

Plaintiffs also do not allege justifiable reliance. They plead reliance in a single sentence: "Plaintiffs relied on Defendants' false statements and their reliance was justifiable." Compl. ¶¶ 194, 200. That is a legal conclusion, not a factual allegation, and should not be credited. *See Volinsky v. Lenovo (U.S.) Inc.*, 2024 WL 1299315, at *7–8 (M.D. Fla. Mar. 27, 2024). Plus, Plaintiffs cannot plausibly allege justifiable reliance when they concede Lender Defendants gave them documents that disclosed the very costs they say were concealed. Compl. ¶¶ 121–22. And the Purchase Agreement disclaimers of reliance on pre-contractual statements (Ex. C § 29; Ex. D § 29) affirmatively defeat reliance. *See Billington v. Ginn-La Pine Island, Ltd.*, 192 So. 3d 77, 84–85 (Fla. 5th DCA 2016).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court compel arbitration of Plaintiffs' claims against Lender Defendants and stay this action pending arbitration. In the alternative, the Court should dismiss loanDepot, Inc. for lack of personal jurisdiction, and dismiss Counts I, II, and III as to Lender Defendants for failure to state a claim.

Dated: September 21, 2026

Respectfully submitted:

*/s/ Lauren G. Raines*
**Lauren G. Raines (FBN: 11896)**
Primary Email: lraines@bradley.com
Secondary Email: jbrandt@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1001 Water Street, Suite 1000
Tampa, FL 33602-5468
Telephone: (813) 559-5500
Facsimile: (813) 229-5946

*/s/ Zachary A. Madonia*
**Zachary A. Madonia** (admitted *pro hac vice)*
zmadonia@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8500
Facsimile: (205) 521-8800

*Attorneys for Defendants loanDepot, Inc. and LGI Mortgage Solutions, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 21, 2026, I electronically filed this document using the CM/ECF system, which will send notification of such filing to the following:

All counsel of record.

*/s/ Lauren G. Raines*
**Lauren G. Raines**